IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, BY KATHLEEN G. KANE, ATTORNEY GENERAL; PENNSYLVANIA DEPARTMENT OF INSURANCE, BY TERESA D. MILLER, INSURANCE COMMISSIONER; AND PENNSYLVANIA DEPARTMENT OF HEALTH, BY DR. KAREN MURPHY, SECRETARY OF HEALTH | : : : : : : : : : : | No. 48 MAP 2015<br><br>Appeal from the Order of the Commonwealth Court at No. 334 MD 2014 dated May 29, 2015<br><br>ARGUED:  October 6, 2015 |
| v. | : : : : : | |
| UPMC, A NONPROFIT CORP.; UPE, A/K/A HIGHMARK HEALTH, A NONPROFIT CORP., AND HIGHMARK, INC., A NONPROFIT CORP. | : : : : : : : | |
| APPEAL OF: UPMC, A NONPROFIT CORP. | : : | |

## OPINION

**MADAME JUSTICE TODD**                                    **DECIDED:  November 30, 2015**

In this case, our Court is principally tasked with reviewing the order of the Commonwealth Court interpreting a provision of a consent decree, negotiated by the Office of Attorney General of Pennsylvania ("OAG")[1] and approved by the

---

[1]  The OAG in this matter is acting in its *parens patriae* capacity to represent the interests of the people of the Commonwealth, and in execution of its duty to supervise charitable entities.  The OAG additionally represents other Commonwealth parties which have been involved in the proceedings in the Commonwealth Court — the Pennsylvania Department of Insurance and the Department of Health.  For ease of (continued…)

Commonwealth Court, between Appellant UPMC, a nonprofit health care corporation, and Appellee Highmark,[2] a nonprofit medical insurance corporation, which establishes the obligations of both parties with respect to certain health care plans serving vulnerable populations — i.e., children, the elderly, and the poor. Specifically, we consider whether the Commonwealth Court erroneously interpreted this "vulnerable populations" provision as creating a contractual obligation for UPMC to treat all participants in Highmark's "Medicare Advantage Plans,"[3] — for which Highmark and UPMC currently have provider contracts which UPMC has indicated it will terminate as of December 31, 2015 — as "in-network" for purposes of determining the rates it is permitted to charge these individuals for physician, hospital, and other medical services during the duration of the consent decree — until 2019.[4]

After careful review, we affirm the order of the Commonwealth Court finding that the vulnerable populations clause of the consent decree requires UPMC to "be in a

---

(…continued)
discussion, we, therefore, will collectively refer to all of these parties as "the Commonwealth."

[2] "Highmark" consists of two corporate entities — UPE ("Highmark Health") and "Highmark Inc." We will refer to both entities, as do the parties and the Commonwealth Court, by the unified designation of "Highmark."

[3] As explained more fully herein, such plans are classified as "Medicare Part C" plans under which the federal government pays a private health insurer such as Highmark a fixed amount per enrollee for the insurer to pay health care providers for providing Medicare Part A (inpatient) and Part B (outpatient) medical services to the enrollee.

[4] As discussed at greater length, *infra*, under the consent decrees at issue in this case, a health care provider who is considered "in-network" with a health insurer has contracted with the health plan to treat the plan members at a negotiated rate. The health plan members are, consequently, charged no more than the plan's co-pay, co-insurance or deductible, and the negotiated rate which is paid by the health plan to the health provider is deemed to be payment in full for the medical services the provider has rendered.

contract" with Highmark for the duration of the consent decree, and, thus, that UPMC physicians, hospitals, and other services shall be treated as "in-network" for participants in Highmark Medicare Advantage plans which are subject to provider contracts between Highmark and UPMC set to be terminated by UPMC on December 31, 2015. We also affirm the portion of the Commonwealth Court's order requiring judicial approval for any further changes in business relationships between these parties which are governed by the consent decree, but quash as not yet ripe for review the portion of the order which directs the OAG to file a request for supplemental relief to effectuate compliance with the consent decree.

## I. Background and Procedural History

As developed by the Commonwealth in the proceedings below, UPMC, which was incorporated in 1982 as a nonprofit corporation under our Nonprofit Corporation Law,[5] is the dominant provider of health care services in western Pennsylvania, occupying nearly 60 percent of the "medical-surgical market" in Allegheny County and, overall, 35.7 percent of this market in the entire 29 county region of western Pennsylvania. Commonwealth Petition for Review, 6/27/14, at 4. UPMC also maintains a controlling interest in an "insurance holding company" which includes the "UPMC Health Plan" which covers approximately 2 million people in western Pennsylvania. Id. As explained by the Commonwealth, under this arrangement, UPMC operates an "integrated health care delivery system" whereby one entity provides health insurance, and, also, delivers health care services through physicians, hospitals, and other ancillary medical care facilities. Id. at 6.

---

[5] 15 Pa.C.S. §§ 5101-5997.

Highmark possesses a controlling interest in an insurance company holding system in which two of its subsidiaries operate not-for-profit health care insurance plans. One subsidiary — Highmark Blue Cross — is a nonprofit hospital insurance plan, and another — Highmark Blue Shield — is a nonprofit health care insurance plan. Commonwealth Court Opinion, 6/29/15, at 3 n.3; Commonwealth Petition for Review, 6/27/14, at 5. Highmark's health care insurance plans are sold, commercially, to businesses and individuals, and, at the time of the filings in this matter, were utilized by more than 60 percent of the people in the western Pennsylvania region's health care market. Commonwealth Petition for Review, 6/27/14, at 5.

In 2002, UPMC entered into a ten-year "provider agreement" with Highmark under which it furnished health care services on an in-patient or out-patient basis to subscribers of Highmark's commercial insurance plans and billed Highmark for those services at specified, negotiated rates. Id. Under the terms of other separate provider agreements covering Highmark's Medicare Advantage products, Highmark and UPMC mutually agreed that UPMC would be considered "in-network" for those products. Stipulations Between the Commonwealth and UPMC, 5/27/15, at 1. However, in the Spring of 2011, UPMC announced it would not agree to renew or renegotiate these provider agreements with Highmark, the majority of which were set to expire on June 30, 2012. Id. UPMC cited as its reason Highmark's proposed affiliation with the West Penn Allegheny Health System, which would create another integrated health care delivery system in competition with the UPMC system. Commonwealth Petition for Review, 6/27/14, at 5-6. The Commonwealth considered the expiration of these agreements as having deleterious consequences for members of Highmark's health insurance plans because, according to the Commonwealth, these members would be subjected to "significantly higher out-of-network charges for their health care needs

unless they either switched their health care provider away from UPMC or their health plan away from Highmark to one of the health insurers with which UPMC had contracted, albeit at higher prices." Id. at 6.

This prospect led to legislative hearings and the appointment of a mediator by then-Governor Tom Corbett in May 2012. UPMC and Highmark entered into a "Mediated Agreement" that month which provided, *inter alia*, that Highmark's Medicare Advantage members would have "in-network access to all UPMC hospitals and physicians" until December 31, 2014. Mediated Agreement, 5/2/12, 1. Under a separate provision of this agreement, UPMC also agreed to "continue to provide in-network hospital and physician services at preferred rates for certain Highmark plans which serve vulnerable populations, specifically Special Care, pa. fair care (sic), CHIP and Guaranteed Issue plans, for such time as these plans, continue to be offered by Highmark." Id. Although there were, in all, eleven individual "Medicare Advantage Provider Agreements" — each signed by Highmark, UPMC, and a hospital in the UPMC system — UPMC, acting on behalf of all of the individual hospitals, and Highmark entered into a global amendment to all of the individual agreements which incorporated the terms of the Mediated Agreement. This global amendment also provided that UPMC and Highmark would "negotiate rates and terms for continued Highmark member access to certain UPMC services on an in-network basis effective upon termination of the Medicare Advantage Provider Agreements, including Western Psychiatric, certain oncological services, UPMC Bedford, and UPMC Northwest." Amendment to Medicare Advantage Provider Agreements, 9/13/12, at 2. Additionally, the global amendment specified that the provider agreements could not be terminated before December 31, 2014, and that, subsequently, each provider agreement would automatically renew from year to year, unless either party provided notice of termination no later than April 1 of

that year. Commonwealth Court Opinion, 6/29/15, at 6. If a party provided such notice of termination, then the termination would be effective as of the end of the calendar year covered by the contract. Id.

On April 29, 2013, the Pennsylvania Insurance Department approved Highmark's affiliation with the West Penn Allegheny Health System, contingent on Highmark fulfilling a number of conditions, one of which included Highmark's obligation to file a formal transition plan with the Insurance Department if it and UPMC could not negotiate new provider agreements by July 31, 2014. Insurance Department Order, 4/29/13, at 22. Thereafter, the already strained relations between UPMC and Highmark deteriorated precipitously. According to the Commonwealth, on June 12, 2013, because it now viewed Highmark as a competing health care provider, UPMC's Board of Directors passed a resolution in which it resolved "to forego 'any extension of the existing contracts, or any new commercial contracts providing Highmark with in-network access to any current UPMC hospitals or physicians in Southwestern Pennsylvania beyond Children's Hospital of Pittsburgh of UPMC, Western Psychiatric Institute and Clinic, UPMC Northwest, UPMC Bedford Memorial and certain other services . . . as specified in the Mediated Agreement.'" Commonwealth Petition for Review, 6/27/14, at 8. The Commonwealth noted that, rather than attempting to negotiate over these matters, the parties escalated their dispute and "engaged in extensive and costly lobbying, advertising campaigns, and litigation which . . . contributed to the public's confusion and misunderstanding." Id. at 10.

In February 2014, Highmark wrote to UPMC and informed UPMC that it had observed that the amount it was paying for the administration of oncology drugs under the fee schedules it had previously negotiated for its commercial and Medicare Advantage products had, in its view, increased dramatically, which Highmark attributed

to hospitals' billing for the administration of such drugs to cancer patients as an outpatient service, even though the drugs were administered in a physician's office. In the letter, Highmark informed UPMC that, effective April 1, 2014 — the date on which the provider agreements were set to renew — it would be revising its outpatient fee schedule under its commercial and Medicare Advantage policy to reduce the fees it paid for the administration of the drugs due to objections raised by its customers, public officials, and other members of the community to these billing practices. Highmark Letter to UPMC, 2/25/14.

UPMC disputed Highmark's claims that the provider agreements permitted it to unilaterally change rates in this fashion, but it did not take any action to terminate those agreements by the April 1 automatic renewal date. On May 9, 2014, UPMC served Highmark with a demand for arbitration which "included the disputed issues regarding oncology billing and Highmark's unilateral rate reductions." Declaration of W. Thomas McGough, Jr., Exhibit 3 to Highmark Answer to Emergency Application for Supersedeas in the Supreme Court of Pennsylvania, at ¶ 24. Subsequently, on June 13, 2014, UPMC submitted a statement of claims to the American Health Law Association ("AHLA") to be arbitrated, which originally covered agreements involving four hospitals, and was later amended in August 2014 to cover agreements involving nine additional hospitals.[6]

---

[6]  These arbitration proceedings were concluded on November 6, 2015, with the arbitration panel ruling that Highmark was not justified in making unilateral adjustments to its fee schedule under the individual commercial provider agreements between Highmark and UPMC, originally set to expire in June of 2012, or under the 2012 Mediated Agreement which extended those individual agreements until December 31, 2014. See In the Matter of the Arbitration between UPMC, et. al, v. Highmark, et. al, AAA No, 01-14-002-1500 (11/6/15). UPMC has filed an application pursuant to Pa.R.A.P. 2501(a) requesting that we consider this decision as supplemental authority. We grant the application; however as this ruling does not purport to address UPMC's duties under the Consent Decree at issue in this case, nor, as we explain infra, did (continued…)

By June 2014, after it became clear that UPMC and Highmark were not going to be able to negotiate a continuation of the provider agreements on their own, the Commonwealth filed a petition for review in the Commonwealth Court, asserting that both Highmark and UPMC had breached the 2012 Mediated Agreement, to which, the Commonwealth contended, the public at large was a third-party beneficiary. As specific relief, the Commonwealth requested, *inter alia*, that the Commonwealth Court find the public to be a third-party beneficiary and, also, require the parties to enter into a variety of agreements to settle disputed issues regarding access to medical care at UPMC facilities by Highmark subscribers after the expiration of the provider agreements on December 31, 2014. Specifically, as relevant to the instant matter, the Commonwealth requested that the court:

> Require that respondents reach an agreement for hospital, physician and follow-up services for Highmark members who are part of vulnerable populations, including, but not limited to consumers age 65 and older who are eligible or covered by Medicare/Medicare Advantage/MediGap health plans; and consumers who are eligible or covered by CHIP, Medicaid, fee-for-service and Medicaid managed health plans within 30 days of this Court's order and, failing such an agreement, impose last best offer arbitration.

Commonwealth Petition for Review, 6/27/14, at 13.[7]

---

(…continued)
Highmark's actions of **claiming** that it was entitled to unilaterally reduce the oncology rates it paid UPMC prior to the entry of the Consent Decree allow UPMC to avoid its obligations under the vulnerable populations' clause of the Consent Decree, we will not address it in this opinion.

[7] The Commonwealth also requested identical relief for the parties' alleged violation of provisions of the Pennsylvania Insurance Company Law, 40 P.S. § 991.2111(1) and 2111(4), through their ongoing contractual dispute.

Thereafter, the Commonwealth Court supervised the Commonwealth's efforts to mediate an agreement which would accomplish this objective, as well as settle the other outstanding and disputed issues between the parties. As the Commonwealth Court noted, because there was such intense acrimony between the parties, they would not negotiate with each other, nor sit together in the same room during the process. Commonwealth Court Opinion, 6/29/15, at 5. Consequently, attorneys representing the Commonwealth parties were forced to engage in what the OAG termed "shuttle" diplomacy, Brief of the Attorney General at 12, whereby they would ferry offers and counteroffers back and forth between the parties. Eventually, the Commonwealth secured a comprehensive agreement between the parties in the form of a consent decree, but, because the parties refused to sign a common document, two final separate consent decrees were prepared — one for Highmark and one for UPMC (collectively, the "Consent Decrees"). Each party's decree has identical provisions except for the fact that Highmark's Consent Decree requires Highmark to comply with its terms, and UPMC's Consent Decree requires UPMC to comply with its terms. Highmark Consent Decree, 6/27/15, at 6; UPMC Consent Decree, 6/27/15, at 6. The Commonwealth parties are signatories to both decrees.

Inasmuch as the present dispute involves the Commonwealth Court's interpretation of UPMC's Consent Decree, we focus our discussion, as do the Commonwealth Court and the parties, on the obligations which UPMC assumed under its decree; however, because its decree and Highmark's are identical in all material respects, including the provisions at issue in this appeal — those governing Vulnerable Populations, defining In-Network care, and providing for the manner in which rates are to be set for In-Network care for the duration of the Consent Decree — for ease of discussion, we shall refer to UPMC's decree by the designation "Consent Decree." The

"Vulnerable Populations" clause of the Consent Decree at the heart of this dispute provides:

> **2. Vulnerable Populations** — [1] UPMC and Highmark mutually agree that vulnerable populations include: (i) consumers age 65 or older who are eligible or covered by Medicare, Medicare Advantage, (ii) Medigap health plans, (iii) Medicaid and/or (iv) CHIP. [2] With respect to Highmark's covered vulnerable populations, UPMC shall continue to contract with Highmark at in-network rates for all of its hospital, physician and appropriate continuity of care services for CHIP, Highmark Signature 65, Medigap and commercial retiree carve out as long as Highmark does not make unilateral material changes to these programs. [3] UPMC shall treat all Medicare participating consumers as In-Network regardless of whether they have Medicare as their primary or secondary insurance. [4] UPMC reserves the right to withdraw from these arrangements if Highmark should take the position that it has the authority to revise the rates and fees payable under those arrangements unilaterally and materially.[8]

§ IV(A)(2).

The Consent Decree defines "In-Network" in the following fashion:

> **I.** "**In-Network**" means where a health care provider has contracted with a Health Plan to provide specified services for reimbursement at a negotiated rate to treat the Health Plan's members. The member shall be charged no more than the co-pay, co-insurance or deductible charged by his or her Health Plan, the member shall not be refused treatment for the specified services in the contract based on his or her Health Plan and the negotiated rate paid under the contract by the Health Plan and the member shall be payment in full for the specified services.

UPMC Consent Decree, § II(I).[9]

---

[8] As detailed *infra*, the meaning and operation of these four numbered sentences are the focus of the parties contentions in this appeal and we have numbered them consistent with the parties' usage.

[9] This provision is II(J) in Highmark's Agreement.

Further, the Consent Decree contains the following provisions explaining how rates for medical services would be determined if the parties could not reach agreement on this subject after good faith negotiations:

**C.     Miscellaneous Terms**

**(1)**                         * * *

**a.     Rates**

i.      For the period, January 1, 2015 to December 31, 2015, rates for all In-Network services covered in this Consent Decree, except for those rates currently being arbitrated by UPMC and Highmark, shall revert to the last mutually agreed upon rates or fees by UPMC and Highmark with the applicable medical market basket index (MBI) increase applied January 1, 2015.

ii.     For rates currently being arbitrated, in the event that the current arbitration between UPMC and Highmark finds in favor of UPMC, then the rates and fees under the Consent Decree will revert to the rates in effect before April 1, 2014 as of the date of the arbitral award and shall remain in place through December 31, 2015.  If as a consequence of the arbitral award, Highmark owes UPMC for underpayments, Highmark shall pay UPMC appropriate interest.  If as a consequence of the arbitral award, UPMC owes Highmark for overpayments, UPMC shall pay Highmark appropriate interest.  If an arbitral award is not decided before January 1, 2015, Highmark shall increase its payments by one-half the difference between Highmark's April 1, 2014 schedule and its rate schedule in effect before April 1, 2014 for the period January 1, 2015 to December 31, 2015.[10]

iii.    For the period beginning January 1, 2016 to the expiration of the Consent Decree or the expiration of any agreements between UPMC and Highmark for all In-Network Services, whichever is later, the rates shall be the rates

---

[10]   As discussed, *infra*, these two provisions refer to the recently concluded AHLA arbitration proceeding which was in progress at the time of the entry of the Consent Decree.

mutually agreed to by Highmark and UPMC, or UPMC and Highmark shall engage in a single last best offer binding arbitration to resolve any dispute as to rates after December 31, 2015 as set forth in paragraph C(2) below.

Consent Decree, § IV(C)(1). The Consent Decree also specified that the Commonwealth was to mediate any "[d]isputed terms set forth in [the] Consent Decree and related to the Consent Decree and unrelated to rate reimbursement" and, if that was unsuccessful, then the dispute was to be submitted to binding arbitration. Id. at § IV(C)(1)(b). The Commonwealth also was given the exclusive "jurisdiction" to enforce the decree. Id. § IV(C)(4).

Additionally, the Consent Decree provides that the Commonwealth Court is to retain jurisdiction, for the duration of its existence, "to enable any party to apply to [the Commonwealth Court] for such further orders and directions as may be necessary and appropriate for the interpretation, modification, and enforcement of this Consent Decree." Consent Decree, § IV (C)(11). President Judge Pellegrini of the Commonwealth Court entered both decrees as orders of court on July 2, 2014, and they remain in effect until July 2, 2019.

On August 29, 2014, Highmark filed its transition plan with the Pennsylvania Department of Insurance which provided, *inter alia*, that "[u]nder the Consent Decrees Highmark and UPMC agreed that UPMC would continue to contract with Highmark at in-network rates for senior care." Highmark Transition Plan, 8/29/14, at 12. With respect to "[c]urrent Medicare Advantage Products," the plan described Highmark's view of the effect of the interplay between the Consent Decrees and these products: "[u]nder the Consent Decrees, seniors in the current broad network Medicare Advantage products will continue to have in-network access to UPMC facilities and physicians after December 31, 2014. The current broad network contracts with UPMC extend until December 31, 2015 and renew annually unless either party provides prior notice." Id.

On September 3, 2014, Highmark commenced a civil lawsuit against UPMC, as well as eight individual UPMC hospitals and three physician group practices, in the Court of Common Pleas of Allegheny County (the "Allegheny County lawsuit"). This suit alleged that UPMC had engaged in unlawful billing practices beginning in August 2010 until the time of the suit by changing the manner in which billing for oncology supplies and services as if they were delivered on a hospital outpatient basis, when, according to Highmark, they were, in actuality, delivered at a physician's office as was the previously established practice. Complaint, 9/3/14, at 4. Highmark also alleged in the suit that UPMC had "begun transferring the billing of oncology services among UPMC hospitals in order to further increase their prices and profits." Id. at 5. Highmark contended these practices "breached the terms of the hospital contracts UPMC and the UPMC Hospitals executed with Highmark." Id. at 4-5. UPMC denied these allegations in its answer to Highmark's complaint.

Additionally, Highmark recited in this complaint the circumstances surrounding its April 1, 2014, adjustment of the fee schedule for reimbursement of the administration of oncology drugs. Related thereto, Highmark asserted that it was "the custom and practice under the UPMC Agreements that Highmark . . . make unilateral changes to the fee schedules to reflect changes in conditions" without prior approval of UPMC; that the UPMC Agreements did not limit Highmark's ability to adjust these fee schedules; that Highmark reserved the right to adjust the fee schedules and rates "at any time," and, when it had done so prior to 2013, UPMC had acquiesced in its action. Id. at 43-44. As relief, Highmark sought a declaratory judgment that its "April 1, 2014 adjustments to the fee schedule rates for Subject Oncology Services under the UPMC Agreements were proper and appropriate under each of the respective UPMC Agreements." Id. at 45. In an amended complaint filed on November 21, 2014, Highmark replaced this declaratory

action count with a claim for unjust enrichment based on the amount it had previously paid for the alleged overbilling by UPMC in the administration of the oncology drugs.[11]

Later in September of 2014, Highmark began marketing a new Medicare Advantage program known as Community Blue, which it had previously invited UPMC to join as an in-network provider in February 2014, but UPMC had declined. As UPMC was not considered an in-network provider under Community Blue, it wrote to Highmark on September 25, 2014, and informed Highmark that it considered this offering to be a breach of the Consent Decree which it viewed as requiring "all UPMC hospitals and physicians to be in network for the 'vulnerable populations' served by Highmark, including Medicare Advantage subscribers." UPMC Letter to Highmark, 9/26/14.

After being made aware of UPMC's objections, the Commonwealth filed a petition for contempt against Highmark contending, *inter alia*, that Highmark had breached the vulnerable populations clause of its Consent Decree, which, as discussed above, is identical to that contained in UPMC's decree. The matter was assigned to Judge Pellegrini for disposition, and he rejected this contention as being unsupported by the plain language of the terms of the vulnerable populations clause:

> Nowhere in the text of the [vulnerable populations clause] provision is there a requirement that Highmark include UPMC in all of its Medicare-Advantage products. Further, while [the vulnerable populations clause] requires UPMC to continue contracting with Highmark at in-network rates for CHIP, Highmark Signature 65, Medigap, and commercial retiree carve-out programs, it does not impose such

---

[11] UPMC thereafter filed preliminary objections to this complaint, accompanied by a motion to compel arbitration based on its contention that Highmark's claims were subject to mandatory arbitration under arbitration provisions in the contracts at issue. In response, Highmark filed a petition to stay arbitration. The trial court overruled UPMC's preliminary objections and granted Highmark's petition. UPMC subsequently appealed this decision, and that appeal remains pending in the Superior Court.

requirements with regard to the Community Blue Program or future products. Although the [vulnerable populations clause] requires UPMC to 'treat' all participating Medicare beneficiaries as in-network, it does not impose any corresponding requirement on Highmark to provide for such in-network care, and we are unwilling to impose such a requirement where none exists.

Commonwealth Court Opinion, 10/30/14, at 17-18.

Thereafter, "serial disputes" continued between the parties over compliance with the decrees which the Commonwealth attempted to mediate, pursuant to the Consent Decrees, but to no avail. Commonwealth Petition to Enforce Consent Decree, filed 4/27/15, at 2-3.

On March 20, 2015, UPMC informed Highmark and the Pennsylvania Insurance Department that it would terminate all of its Medicare Advantage hospital contracts on December 31, 2015 based on Highmark's assertion in its Allegheny County lawsuit that it had the right to change the rates under its contracts with UPMC for the administration of the oncology drugs and its claim that UPMC had overcharged it for that and other medical services from August 2010 forward. UPMC claimed that the language of the vulnerable populations clause gave it the right to engage in such unilateral termination. In response, the Commonwealth filed with the Commonwealth Court a motion to enforce the Consent Decrees which was the genesis of the litigation spawning the instant appeal.

On May 27, 2015, Judge Pellegrini conducted a ten-hour hearing on this motion. In order to determine UPMC's obligations with respect to Highmark's Medicare Advantage programs, Judge Pellegrini received extensive testimony describing the general characteristics and function of Medicare Advantage programs in delivering

health care to seniors, and the coverage of the specific Highmark Medicare Advantage programs at issue in this case. In this regard, he heard from Darlene Sampson, who is the Director of the Pennsylvania Department of Aging's Apprise Program, Pennsylvania's state health insurance assistance program, in which capacity she was responsible for educating Medicare beneficiaries and assisting them in understanding Medicare coverage. N.T. Hearing, 5/27/15, at 41, 43. Sampson described the structure of the federal Medicare Program as consisting of four parts — A through D — with Part A providing coverage for hospital services, Part B providing coverage for outpatient and physician services, Part C establishing the Medicare Advantage Programs, and Part D providing prescription drug coverage. Id. at 53. Sampson explained that, if an individual is enrolled in Medicare Advantage, he or she is still considered to be a part of the federal Medicare program and receives Medicare Part A and B benefits through the Medicare Advantage program. Id. at 66. Sampson testified that the principal difference between the traditional Medicare Part A and B programs and Medicare Advantage is in how the plans are administered: when an individual receives Medicare Part A and B, the federal government manages the administration of the Medicare benefits, whereas a Medicare Advantage program is run by a private insurance company which contracts with the federal government (the Centers for Medicare and Medicaid Services ("CMS")), and the insurance company manages the administration of Medicare benefits and pays claims. Id. at 53-54.

The Commonwealth also called Barbara Gray — Highmark's Senior Vice President of Senior Markets — who is responsible for Highmark's Medicare Advantage and Medigap insurance products. She agreed with Sampson's description of the

Medicare Advantage program, opining that it is "a type of Medicare product," and that "if you're in Medicare Advantage you're still covered by Medicare and you're afforded all the rights and privileges and protections . . . of Medicare." Id. at 82. Gray testified further that those who are enrolled in Medicare Advantage plans are members of Medicare, and that such Medicare Advantage programs are required to provide, at a minimum, the same benefit amounts which are provided by Medicare Parts A and B. Gray noted that, frequently, Medicare Advantage programs furnished a greater monetary benefit value to an enrollee; however, Medicare Advantage programs also restrict a participant's choice of hospital or doctor to those who are part of networks specified by the insurer administering the plan.[12] Id. at 108-09.

Gray noted that Highmark offered two types of Medicare Advantage plans which had UPMC hospitals in their networks: Security Blue, which is an HMO that pays no out-of-network benefits, and Freedom Blue, which is a Preferred Provider Organization ("PPO") offering some out-of-network coverage under which members pay the difference between the, lower, covered amount and the actual cost of treatment.[13] Id. at 98. Gray related that such plans automatically renew each year unless the plan participant takes affirmative steps to change them, and she estimated that there are approximately 145,000 current subscribers to both plans. Id. at 103.

[12] The insurer offering such Medicare Advantage plans is required to submit information regarding the plan to CMS for initial approval, and annual bids detailing policy and rate changes. Such plans must describe the physicians and hospitals, which will be part of the plan's network. Commonwealth Court Opinion, 6/29/15, at 16; N.T. Hearing, 5/27/15, at 83-84.

[13] Highmark continues to offer Community Blue which does not include UPMC within its network of hospitals.

On this matter, UPMC presented the testimony of the only witness it called at the hearing — Shawn Maree Bishop, the owner of a Washington D.C. based consulting firm which provides representation to organizations and companies which use Medicare Advantage plans, and companies which perform outsourced services for such plans. Id. at 318. Bishop, who was qualified as an expert based on her work as a consultant and prior service in the federal government, including for CMS, opined that, while it was true that Medicare Advantage was part of the Medicare program, it was a distinct program governed by different statutes and regulations, and that a person could not have traditional Medicare and Medicare Advantage at the same time. Id. at 323-24. She testified that she had not encountered the terms "Medicare participating consumers" in the Medicare statutes or regulations, but opined that this phrase meant traditional Medicare, not Medicare Advantage, and that she viewed the requirement of the vulnerable populations clause requiring "Medicare participating consumers" to be treated as "in-network" to refer to a commercial insurance product which is not part of the Medicare program. Id. at 328-29, 331. Bishop acknowledged that, under Medicare Advantage, the reimbursement rates are negotiated directly between the insurer and the provider; whereas, under Medicare Part A and B, CMS sets the reimbursement rates. Hence, if a provider chooses to participate in the Medicare Part A and B program, those are the rates which it receives, and there is no negotiation. Id. at 359.

None of these witnesses — Sampson, Gray, or Bishop — participated in the negotiation of the Consent Decree. The only witness who participated in that process, and testified as to the circumstances surrounding the choice of its language, was Deborah Rice-Johnson, the President of Highmark. She testified that the vulnerable

populations clause was structured in the manner in which Highmark had proposed it — as including Medicare Advantage members within the definition of all Medicare participating consumers so that they would be treated in-network. Id. at 208. President Rice-Johnson testified that the vulnerable populations clause was the subject of extensive back and forth negotiations between the parties, and that the second sentence of that clause had originally included Medicare Advantage, but that Highmark requested that program be deleted from that sentence because Highmark wanted to ensure that it was protected if it offered other Medicare Advantage programs such as its Community Blue program. Id. at 210-11, 215. Rice-Johnson indicated that her understanding of the term "Medicare participating consumers" in the third sentence during the negotiations was that it included all of Highmark's Medicare members, i.e., those of its customers in Medicare Advantage contracts with Highmark, and not those individuals enrolled in Medicare Parts A and B, for which Highmark has no contractual relationship. Id. at 255, 274-75. Consequently, in her view, because the third sentence of the vulnerable populations clause obligated UPMC to treat all Medicare participating consumers as "In-Network," and the Consent Decree further defined "In-Network" as when a health care provider "has contracted" with the insurer to provide health care services at negotiated rates, this sentence required UPMC to be in contract with Highmark for the duration of the Consent Decree. Id. at 215, 270, 273-74. Rice-Johnson further testified that, because the term "In-Network" refers to negotiated rates, and because the government does not negotiate rates for Medicare Part A and B, this term has no meaning as applied to Medicare Part A and B. Id. at 273-74.

Rice-Johnson also testified regarding the impact of the Allegheny County lawsuit. She claimed that this complaint addressed the period of time prior to March 14, 2014, and it was not an effort to change the rates that it would be required to pay UPMC under Medicare Advantage from January 1, 2016 forward, as such rates would be set by binding arbitration under the terms of the Consent Decree. She noted that Highmark had claimed only that it had the right to change fee schedules under the provider agreements in April 2014, when those agreements were renewed with those changed fee schedules, but she denied that Highmark took the position that it had the right to change such rates under the Medicare Advantage contracts during the term of the Consent Decree. She testified that Highmark viewed the Consent Decree as limiting its ability to make any further such changes: "Once we entered into the arrangement with the Consent Decree, that limited our ability to do so. So during the period of the Consent Decree forward, we will not change rates unless they are mutually agreed upon or agreed through arbitration." Id. at 186. She further stated, "[o]nce we entered into the Consent Decree, we agreed we would not change fee schedules until the end of that Consent Decree." Id. at 198. President Rice-Johnson also related that Highmark considered the arbitration clause in the Consent Decree as preserving the right for Highmark and UPMC to arbitrate the question of whether Highmark was entitled to make the change in the oncology fee schedules in 2014. Id. at 221, 256-57.

Two days after the hearing, on May 29, 2015, based on the filings and responses of the parties and the evidence presented at the hearing, Judge Pellegrini issued an order granting the Commonwealth's Motion to Enforce the Decree in which he made the following findings and directives to the parties:

**ORDER**

**WHEREAS**, the parallel consent decrees entered into by the parties with the Commonwealth are only at issue in this matter;

**WHEREAS**, I find that Medicare Advantage participants are included within the definition of "Medicare participating consumers" in the third sentence of the Vulnerable Populations' paragraph of UPMC's consent decree, UPMC consent decree §IV(A)(2);

**WHEREAS**, I find that Highmark did not take the position that it had the authority to unilaterally revise the rates and fees payable to UPMC after June 27, 2014, the date the consent decrees were executed, and did not revise any rates paid to UPMC;

**WHEREAS**, I find that Highmark did not violate the fourth sentence of the Vulnerable Populations' paragraph of the consent decrees. See UPMC consent decree §IV(A)(2); *see also Id.* §IV(C)(1)(a)(ii);

AND NOW, this 29th day of May, 2015, upon consideration of the Commonwealth's Motion to Enforce Consent Decrees and Compel Arbitration and Respondents' replies thereto, the evidence presented at the hearing on May 27, 2015, and the findings that I have made, the Commonwealth's Motion is granted.

It is further ordered that:

1. Respondent UPMC shall be in a contract with Highmark Health and Highmark, Inc. (collectively, Highmark) and be an in-network provider for Highmark Medicare Advantage Plans for physicians, hospitals, and other services for the term of the consent decrees.

2. If the parties are unable to negotiate terms for payment owed by Highmark to those entities or other terms and conditions of the Plans:

A. By July 1, 2015, Respondents shall submit a joint statement identifying all remaining and unresolved issues to be determined pursuant to the

UPMC-Highmark Joint Plan for Single Last Best Offer Arbitration under Consent Decrees entered separately with the Commonwealth of Pennsylvania as approved by this Court's November 24, 2014 Order.

B. By the same date, the Respondents shall select an arbitrator in a manner provided for in the November 24, 2014 Order, or the Court will select the arbitrator.

C. Respondents shall complete the arbitration of outstanding issues identified no later than September 30, 2015.

D. Respondents shall provide this Court and the Commonwealth with monthly status reports commencing on July 1, 2015, and continuing until the arbitration decision is rendered.

3. Neither Respondent shall make any changes to any Plan, contract, or other business relationship between UPMC and Highmark Health/Highmark, Inc., no matter how small, without first securing approval from the Court.

4. The Commonwealth will file a request for supplemental relief to effectuate compliance with the consent decrees, including but not limited to, changes in corporate governance.

Order, 5/29/15, at 1-3.

In his opinion accompanying this order, Judge Pellegrini explained his interpretation of the third sentence of the vulnerable populations clause as establishing a duty on the part of UPMC to treat Highmark customers as "in-network" for the duration of the Consent Decree:[14]

---

[14] In his opinion, Judge Pellegrini also found that the second sentence of the vulnerable populations clause "extends UPMC's in-network contracting duties to the [Medicare Advantage] Plan," Commonwealth Court Opinion, 6/29/15, at 27, however, neither Highmark nor the Commonwealth advances this contention in the present appeal. (continued…)

I disagree that the phrase 'Medicare participating consumers' in the third clause must be interpreted as excluding [Medicare Advantage] participants. Doubtlessly, as the testimony establishes, there are significant similarities and differences between Highmark's [Medicare Advantage] Plan and original Medicare. Notably, however, the consent decree does not limit UPMC's provision of in-network service to 'Medicare' participants, but rather, provides that such services must be provided to 'all Medicare participating consumers,' which encompasses [Medicare Advantage] participants. Had the drafters intended to limit UPMC's duty to give in-network treatment only to Medicare participants, it easily could have stated 'Medicare' instead of 'Medicare participating consumers' as it does in the first sentence. However, the first sentence groups together Medicare and [Medicare Advantage] participants, and this grouping re-appears as the phrase 'Medicare participating consumers' in the third sentence. Critically, if I construe the third sentence to apply only to Medicare participants, the provision would purport to establish via contract original Medicare participants' in-network access rights to UPMC. Yet, the parties agree that these rates are set exclusively by CMS and cannot be abrogated by private contract. Therefore, under UPMC's reading of the third sentence, the provision sets forth UPMC's already-existing duty to treat Medicare participants as in-network, rendering it superfluous at best, and insofar as it purports to negotiate the CMS rates, illegal. (See UPMC consent decree § (II)(I)(defining 'in-network')).

Commonwealth Court Opinion, 6/29/15, at 27-28. In making this finding, Judge Pellegrini did not credit the testimony of Bishop as it pertained to the interpretation of the phrase "Medicare participating consumers." He noted that she was not an expert in the field of contract interpretation, and that she acknowledged that, in her experience in

---

(…continued)
Consequently, for reasons we explain, *infra*, because we consider UPMC's obligations to Highmark's Medicare Advantage customers to be established by the third sentence of the vulnerable populations clause, which Judge Pellegrini cited in his order as the basis for granting relief, we need not address Judge Pellegrini's analysis of the second sentence.

the field of Medicare, "Medicare participating consumer" was not a term of art that had acquired a special meaning.

In his opinion, Judge Pellegrini also rejected UPMC's argument that his prior interpretation of this clause in his October 30, 2014 opinion had already decided this question. He reasoned that he was construing Highmark's obligation under this provision, not UPMC's; thus, it did not control the question of UPMC's duties under this clause. He pointed out that in the previous opinion he expressly found that the third sentence of the vulnerable populations clause, "which governs the present issue 'requires UPMC to 'treat' all participating Medicare beneficiaries as in-network," but did not impose a corresponding obligation on Highmark. Commonwealth Court Opinion, 6/29/15, at 29. By contrast, Judge Pellegrini found that the present dispute concerned only UPMC's duties under the first and third sentences of the clause. Nevertheless, he considered his present interpretation and his prior one to be consistent "insofar as both recognize UPMC's duty, under the third clause to treat all Medicare participating consumers as in-network." Id. at 30. Moreover, he observed, "[t]he instant opinion, however, goes a step farther in defining 'Medicare participating consumers' to include the beneficiaries of [Medicare Advantage] contracts." Id. at 30.

Additionally, Judge Pellegrini rejected UPMC's argument that it was permitted to terminate the Medicare Advantage agreements under the fourth sentence of the vulnerable populations clause due to the Allegheny County lawsuit. He found that the Consent Decrees specifically addressed this dispute through the arbitration clause in Section IV(C)(1)(a)(ii) set forth above:

> There can be no doubt that the dispute referenced in
> this section, and the rates being arbitrated at the time the

consent decrees were entered, were the oncology rates. At the time the consent decrees were executed, UPMC's initial arbitration demand concerning oncology rates was pending before the AHLA. Further, it is undisputed that Highmark effectuated its revised rates on April 1, 2014. The [arbitration] provision above makes clear that if Highmark is unsuccessful at arbitration concerning the oncology rates, the rates must revert to those in place before Highmark's unilateral revision and Highmark must pay interest on the outstanding amounts.

Id. at 31. Judge Pellegrini found that this provision must be construed together with the vulnerable population's clause to reflect the parties' intent that Highmark be able to resolve, through the arbitration process, the question of whether it was entitled to change the oncology fee schedules in April 2014.

In response to UPMC's allegation in a motion for an emergency stay filed with our Court, that Judge Pellegrini had appointed himself "Health Care Czar of Western Pennsylvania" through the inclusion of paragraphs 3 and 4 of his order, Judge Pellegrini denied that he had arrogated such plenary authority. He explained that his order did not require his review of every aspect of the business relationship between Highmark and UPMC, but, rather, was confined only to precluding Highmark and UPMC from "altering without court approval their contracts and business relationships that involve matters within the scope of the consent decrees, over which this Court retains jurisdiction." Id at 34-35. Judge Pellegrini deemed this appropriate, given the fact that the current dispute affected nearly 180,000 Blue Cross subscribers, and that, in his view, given the parties' contentious history, "such a directive is 'necessary and appropriate for the . . . enforcement' of the consent decrees, particularly with regard to the vulnerable populations who, as the testimony established, are the true casualties of the ongoing dispute." Id. at 35.

As for the fourth paragraph of his order which instructs the Commonwealth to file a request for supplemental relief in order to effectuate compliance with the Consent Decree, including seeking changes in corporate governance, if warranted, he viewed that directive as consistent with both the vulnerable populations provision of the Consent Decrees, and the other Consent Decrees provisions giving the Commonwealth enforcement power and the Commonwealth Court continuing jurisdiction to effectuate compliance with the decree. Moreover, he deemed such action to be consistent with provisions of the Non-Profit Corporation Law, which place upon the director of such corporations the duties of a trustee as if the charity was not incorporated, 15 Pa.C.S. § 5547(a), and which allow the removal of directors of such corporations, 15 Pa.C.S. § 5726.

UPMC appealed Judge Pellegrini's order and requested expedited review. Because of the importance of the resolution of the questions raised by this appeal to the people of the Commonwealth affected by this dispute, we granted that request. In its appeal, UPMC presents three issues for our consideration:

> 1. Did the Commonwealth Court erroneously interpret [the vulnerable populations clause] of the Commonwealth/UPMC Consent Decree to require UPMC to "be in a contract with Highmark" as to Medicare Advantage, where the plain language of the consent decree — as confirmed by the drafting history, parties' admissions, and a prior interpretation of the same provision by the same judge of the Commonwealth Court — preserves the parties' ability to terminate their Medicare Advantage contracts with each upon proper notice?
>
> 2. Did Highmark "take the position" that it has authority to unilaterally and materially revise the rates and fees payable under its Medicare Advantage contracts with UPMC under [the vulnerable populations clause] of the Consent Decrees — thereby triggering, *inter alia*, UPMC's right to withdraw

from Medicare Advantage provisions of the Consent Decrees — where, among other things, both the Commonwealth and Judge Pellegrini admitted that Highmark had indeed taken that position?

3. Did the Commonwealth Court violate due process by ordering sweeping relief that no party requested, that was expressly released by the Consent Decrees, and that exceeded the Court's constitutional authority?

UPMC Brief at 5-6.[15]  We consider these issues *seriatim*.

## II. Issue One

UPMC first argues that the Commonwealth and Highmark have, since the time of the execution of the Consent Decree, demonstrated through their actions that the vulnerable populations clause of the Consent Decree allows it to terminate its Medicare Advantage contracts at any time.  Specifically, UPMC claims that Highmark acknowledged UPMC's right to terminate its Medicare Advantage contracts in its transition plan filed with the Insurance Department when it admitted that "[t]he current broad network contracts with UPMC extend until December 31, 2015 and renew annually unless either party provides prior notice."  UPMC Brief at 32 (citing Highmark Transition Plan at 1(a)).  UPMC refers to an internal strategy discussion by Highmark Senior Vice President Gray in which she discussed the impact the terminations would have on their business. According to UPMC, the fact that Gray discussed this fact was evidence of Highmark's belief that UPMC had the right to execute such a termination. UPMC also cites a March 13, 2015 letter from the Chief Legal Officer of Highmark,

---

[15]  We have jurisdiction over this appeal from the order below pursuant to Pa.R.A.P. 311(a)(4) ("An appeal may be taken as of right . . . from . . . An order that grants or denies, modifies or refuses to modify, continues or refuses to continue, or dissolves or refuses to dissolve an injunction.").

Thomas Van Kirk, to the Chief Legal Officer of UPMC, Thomas McGough, in which it agreed to refrain from making unilateral changes to rates and fees in its Medicare Advantage contracts if UPMC agreed to keep them in effect for the duration of the Consent Decree.

UPMC also claims, as evidence of the Commonwealth's belief that UPMC possessed the right to terminate the Medicare Advantage agreements, that when it made the Commonwealth aware of its intention to terminate the Medicare Advantage contracts in the fall of 2014, the Commonwealth never responded to those letters. Also, UPMC points to a preliminary internal draft of a press release prepared by the Insurance Department in which the department's press secretary stated that the Medicare Advantage contracts could be terminated at the end of 2015.

Turning to the language of the vulnerable populations clause itself, UPMC notes that Medicare Advantage is not contained within the enumerated list of programs set forth in the second sentence of that clause and that this omission was purposeful since Highmark wanted the option to introduce its new Community Blue HMO at the time it was negotiating the Consent Decree; hence, in UPMC's view, this sentence did not compel it to continue its Medicare Advantage contracts with Highmark. UPMC points to the fact that the Consent Decree provides that it is not to be construed as a contract extension. UPMC Brief at 37 (quoting Consent Decree at I (A)). With respect to the third sentence of the vulnerable populations clause, UPMC argues that it appears as it did throughout the original negotiations of the Consent Decrees; thus, it contends that the absence of any change to the phrase "Medicare participating consumers" indicated the parties' intent to give that term its original meaning — i.e., traditional Medicare as used

in the first sentence of the vulnerable populations clause. UPMC points out that Medicare and Medicare Advantage are defined separately in that sentence, and, if Medicare and Medicare Advantage were to be considered to be the same program, then there would have been no need to define them separately. UPMC argues that the term Medicare cannot be given different meanings in adjacent sentences. In UPMC's view, construing Medicare and Medicare Advantage distinctly would be consistent with how the federal government treats both programs since they are created by different statutes and are governed by different regulations, and a subscriber cannot be in both programs at once.

UPMC instead suggests that the third sentence of the vulnerable populations clause is, in actuality, a coordination of benefits clause intended to cover situations when an employee is covered by two medical plans, one which is commercial insurance, and the other which is Medicare. In such situations, the commercial insurance can either be the primary or secondary payer to Medicare depending on the size of the business.[16] The effect of this clause, according to UPMC, is to require that all Medicare participants be in-network whether or not Medicare is a primary or secondary payer. UPMC avers that Highmark acknowledged the effect of this clause at the hearing.

---

[16] See generally, U.S. Department of Health and Human Services, Medicare and Other Health Benefits: Your Guide to Who Pays First, at 6, 12 (explaining that, for those 65 and older who work for an employer with 20 or more employees the commercial group health insurance plan pays first and Medicare is a secondary payer; whereas, if the employer has less than 20 employees, Medicare is the primary payer and the group health plan is the secondary payer); Testimony of Shawnee Bishop, N.T. Hearing, 5/27/15, at 324-27.

Further, UPMC claims that it would be illogical to read this sentence as creating an obligation to treat Medicare Advantage members as "In-Network" and then restrict, in the second half of the sentence, coordination of benefits to only those in the traditional Medicare program. UPMC claims that Judge Pellegrini improperly disregarded the effect of the second part of the sentence by his interpretation. UPMC further avers that, if all Medicare related programs are included within "Medicare participating consumers," such as Medigap, which is also a Medicare related program, then it would render coordination of benefits impossible as a matter of law. UPMC maintains that it is inconsistent for Judge Pellegrini to interpret the vulnerable populations clause as requiring UPMC to contract with Highmark with all Medicare Advantage products, when he ruled previously that Highmark was under no obligation to contract with UPMC for its Community Blue plan.

Highmark responds that the Consent Decree is a contract between it and UPMC; hence, it must be interpreted in accordance with fundamental contract law principles, namely, that all of the provisions of a contract must be considered in light of the purpose of the contract and construed in a manner which gives effect to all of those provisions. Highmark stresses that the vulnerable populations clause, when read together with the Consent Decree as a whole, had the core purpose of ensuring that Highmark Medicare Advantage customers could continue to access UPMC providers on an in-network basis, as they had done in the past, until the expiration of that decree. Highmark argues that Judge Pellegrini properly recognized that the fundamental purpose of the negotiation and entry of the Consent Decree was to ensure that vulnerable populations, such as senior citizens, would be provided with medical services, and the Consent

Decree served to lessen the anxiety of those vulnerable populations who were Highmark subscribers by securing in-network access to UPMC physicians and facilities until 2019.

Highmark avers that the multiple sentences contained in the vulnerable populations clause should, therefore, be read as a whole to fulfill that purpose. In Highmark's view, the first sentence of the vulnerable populations clause, by specifying that vulnerable populations include those seniors who have or are eligible for Medicare Advantage, serves to indicate that the protections of the vulnerable populations clause, as a whole, are extended to those in Highmark's Medicare Advantage programs, inasmuch as Medicare Advantage members are considered to be participating in the Medicare program under federal law — a fact acknowledged by the Medicare program itself on its website www.medicare.gov. Highmark contends that the third sentence of the vulnerable populations clause serves the purpose of providing that protection to these individuals "by requiring UPMC to treat 'all Medicare participating consumers,' which includes Medicare Advantage members, as In-Network." Highmark Brief at 28. Highmark avers that, because "In-Network" is defined by the Consent Decree as when UMPC "has contracted with" Highmark, this imposes an obligation on UPMC to be in a Medicare Advantage contract with Highmark. Id.

Highmark disputes that UPMC's reliance on the Consent Decree's statement that it is not a contract extension excuses it from its obligation to continue to provide in network access to UPMC facilities for certain categories of its customers. Highmark contends that the Consent Decree requirements "trumped" any termination rights

contained in the existing individual contracts it had with UPMC as, in its view, "that was the whole point of the Consent Decree." Highmark Brief at 30.

Highmark next contends that UPMC's reading of the third sentence of the vulnerable populations clause as defining Medicare participating consumers as only those enrolled in traditional Medicare, but not in Medicare Advantage, would, if accepted, result in the sentence having no meaning with respect to Highmark since the "In-Network" requirement of that section contemplates a contract between a health plan and a provider to provide services for reimbursement, but traditional Medicare is paid directly by the federal government to the provider for performing health care services and does not involve any contract by Highmark with a health care provider. Rather, Highmark considers it as having meaning if applied to Medicare Advantage, as such a program fits within the definition of "In-Network" under the Consent Decree, because it is a contract between it and UPMC to provide health care services for reimbursement.

Regarding UPMC's argument that Judge Pellegrini improperly disregarded the last portion of the third sentence which, in UPMC's view, demonstrated that this sentence was a coordination of benefits clause, Highmark posits that, even if the last portion of the sentence were interpreted to function in the capacity of a coordination of benefits clause, it does not change the plain meaning of the language of the entire sentence, which establishes UPMC's obligation to treat all Medicare participating consumers as in-network. Moreover, Highmark points out that, under relevant federal regulations, see 42 C.F.R. § 422.108 (establishing secondary payment procedures for Medicare Advantage when "Medicare is not the primary payer."), Medicare Advantage can function as either the subscriber's primary or secondary insurance; thus, the third

sentence cannot be construed as being limited to only traditional Medicare. Highmark Brief at 33.

Highmark also rejects UPMC's contention that the second sentence of the vulnerable populations clause, which requires it to continue to contract, is the exclusive source of its obligations under the vulnerable populations clause, since that interpretation disregards the third sentence entirely. Highmark proffers that the second sentence of the vulnerable populations clause enumerates programs, which are not Medicare programs, such as CHIP, Highmark 65, and Medigap, and that sentence requires UPMC to be in a contract for those programs, whereas the third sentence requires UPMC to be in a Medicare Advantage contract with Highmark. Highmark highlights that, as Rice-Johnson's testimony showed at the hearing, the reason that Medicare Advantage was deleted from the second sentence was so that it could offer its Community Blue program without being accused of making a unilateral change to its Medicare Advantage program in violation of the restrictions of that sentence. Highmark asserts that, in making this deletion, it had no intention to exclude the subscribers to its existing Medicare Advantage programs — Security Blue and Freedom Blue – from the protections of the vulnerable populations clause, and that it considered those subscribers to still be protected under the third sentence of the clause.

Highmark disputes that it ever engaged in any course of conduct that indicated that it acquiesced in UPMC's interpretation of the vulnerable populations clause. It describes UPMC's assessment of the statements in question made in reports and correspondence by its employees as being "cherry-picked" and taken out of context. It argues that, when these materials are examined in their entirety, they reveal no

admissions or conduct by Highmark indicating its agreement with UPMC's interpretation of the vulnerable populations clause.

In its brief, the Commonwealth aligns entirely with Highmark's interpretation of the vulnerable population's clause. The Commonwealth avers that the term "Medicare participating consumer" is, as Judge Pellegrini recognized, not a term of art; hence, in the Commonwealth's view, it should be given its ordinary and accepted meaning — that is, a consumer who participates in the Medicare program.  The Commonwealth agrees with Highmark that those who subscribe to a Medicare Advantage policy are participating in the federal Medicare program and that they have the same rights and protections as those who are enrolled in Medicare Parts A and B.  The Commonwealth disputes that Medicare Advantage is a distinct program as UPMC has contended, pointing out that Medicare Advantage is statutorily designated Part C of the Medicare program; therefore, it must be viewed, along with parts A and B of Medicare, as a "distinct part of the same program."  Commonwealth Brief at 27.

The Commonwealth rejects UPMC's assertion that the last clause of the third sentence — "whether they have Medicare as their primary or secondary insurance" — renders the entire sentence as only a coordination of benefits clause. The Commonwealth asserts that this would be inconsistent with the plain meaning of Medicare that includes all of its individual parts.  Moreover, the Commonwealth stresses that such a reading would be inconsistent with the entire purpose of the Consent Decree.  As the Commonwealth describes this purpose:

> The whole purpose of the consent decree — the reason why the Commonwealth got involved in this corporate spat in the first place — is to protect the consumers who might be injured by it. The first sentence of the Vulnerable Populations

provision expressly *includes* Medicare Advantage members as part of that vulnerable population; and yet, according to UPMC, the provision then goes on to *exclude* them from any protection whatsoever. UPMC does not attempt to explain what purpose would be served by such a provision, and none comes to mind.

Commonwealth Brief at 28 (emphasis original). The Commonwealth also endorses Judge Pellegrini's conclusion that, if the terms Medicare participating consumer are construed as excluding Medicare Advantage members, then the clause is meaningless and illegal since the rates for Medicare are "set exclusively by CMS and cannot be abrogated by private contract." Id. at 29.

The Commonwealth argues that the extrinsic evidence relied on by UPMC involving Highmark's course of performance should not be considered since the contract is, in its view, not ambiguous, and UPMC makes no argument that it is. Further, even if the Consent Decree were to be considered ambiguous, then its meaning is a question of fact which is properly resolved by the finder of fact, and the Commonwealth Court below rejected UPMC's arguments.

In any event, the Commonwealth maintains that UPMC's evidence does not support the conclusion that Medicare Advantage members were not intended to be protected under the Consent Decree. The Commonwealth notes that any statements by Highmark subsequent to the entry of the decree do not bind the Commonwealth. Moreover, the Commonwealth points out that Highmark, at UPMC's insistence, is not a party to its own Consent Decree. With respect to the transition plan filed with the Insurance Department, the Commonwealth characterizes it as a general description of Highmark's business relationships with UPMC and does not speak to the meaning of the vulnerable populations clause. As for its lack of response to UPMC's letters in the

Fall of 2014 in which it expressed the view that Highmark had triggered UPMC's right to withdraw from the Consent Decrees, the Commonwealth asserts that it was under no obligation to respond to every letter from UPMC indicating that it was "evaluating" taking a particular course of action. The Commonwealth denies that it ever accepted UPMC's contention that it had the right to withdraw from the Consent Decrees, and that its non-response to those letters cannot be construed as a formal legal agreement with UPMC's contention in this regard.

As the parties and the Commonwealth Court have recognized, a consent decree is a contract which has been given judicial sanction, and, as such, it must be interpreted in accordance with the general principles governing the interpretation of all contracts. Int'l Org. Master, Mates & Pilots of Am., Local No. 2 v. Int'l Org. Masters, Mates & Pilots of Am., Inc., 439 A.2d 621, 624-25 (Pa. 1981). In interpreting the terms of a contract, the cardinal rule followed by courts is to ascertain the intent of the contracting parties. Lesko v. Frankford Hosp.-Bucks Cnty., 15 A.3d 337, 342 (Pa. 2011). If the contractual terms are clear and unambiguous on their face, then such terms are deemed to be the best reflection of the intent of the parties. Kripp v. Kripp, 849 A.2d 1159, 1162 (Pa. 2004). If, however, the contractual terms are ambiguous, then resort to extrinsic evidence to ascertain their meaning is proper. Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 429 (Pa. 2001). A contract's terms are considered ambiguous "'if they are subject to more than one reasonable interpretation when applied to a particular set of facts.'" Id. at 430.

In the present matter, and as our threshold determination, the term "Medicare participating consumers" used in the vulnerable populations clause of the Consent

Decree cannot be considered clear and unambiguous, as evidenced by the disparate interpretations advanced by the parties in this matter, each of which, taken on its face, can be considered reasonable. Thus, given the ambiguity of these terms, as applied to the Medicare Advantage policies at issue,[17] it was proper for Judge Pellegrini to take evidence on the question of the meanings of these terms and to rely on such evidence in interpreting these terms.[18] See Int'l Org. Master, Mates & Pilots, 439 A.2d at 624 (in ascertaining the meaning of the terms of a consent decree, a court "may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement"). To the extent that the court's findings of fact and credibility determinations are supported by the record, we will defer to them. Messina v. East Penn Township, 62 A.3d 363, 366 (Pa. 2012). However, we review the court's legal conclusions *de novo*. Id.

In addition, our review is guided by certain principles, or canons, of contract interpretation. See Hutchison v. Sunbeam Coal, 519 A.2d 385 (Pa. 1986) (construing ambiguous language of a contract through examination of extrinsic evidence and the application of canons of interpretation). Four such principles, some of which, as discussed above, have been referenced by the parties in their arguments, are applicable to the instant case. First, "the entire contract should be read as a whole . . .

---

[17] These are the two Highmark Medicare Advantage plans in existence at the time the consent decree was entered into — Security Blue and Freedom Blue — which include UPMC as an "in-network" provider.

[18] See Commonwealth Court Order, 5/29/15, at 2 (resting determination "upon consideration of . . . the evidence presented at the hearing").

to give effect to its true purpose." Pritchard v. Wick, 178 A.2d 725, 727 (Pa. 1962). Second, a contract must be interpreted to give effect to all of its provisions. Murphy, 777 A.2d at 429. Thus, our Court "will not interpret one provision of a contract in a manner which results in another portion being annulled." LJL Transp. v. Pilot Air Freight, 962 A.2d 639, 648 (Pa. 2009). Third, "a word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons," such as thwarting the intent of the agreement. Maloney v. Glosser, 235 A.2d 607, 609 (Pa. 1967). And, finally, a party's performance under the terms of a contract is evidence of the meaning of those terms. Atlantic Richfield v. Razumic, 390 A.2d 736, 741 (Pa. 1978).

In considering the entirety of the evidence of record surrounding the formation of the Consent Decrees to discern their true purpose, it is abundantly clear, based on the history of the contentious interactions between the parties recited above, that the Commonwealth specifically intended them to provide a measure of enduring certitude and security for health care consumers who were members of certain Highmark health care plans, that they would not incur significant costs in seeking treatment at UPMC facilities if UPMC followed through on its promise to terminate provider contracts for these plans at the end of 2014. The record also reflects that the Commonwealth was particularly motivated to seek the Consent Decrees to alleviate the justifiable concerns it had over the deleterious impact these looming terminations would have on certain groups of vulnerable individuals most likely to be in need of access to UPMC facilities or medical treatment, but who, because of their circumstances, would have the greatest difficulty in paying higher out-of-network costs, or obtaining other insurance for such care. This included all those individuals enrolled, or eligible to be enrolled, in

Highmark's then extant Medicare Advantage plans. See Commonwealth Petition for Review, 6/27/14, at 13; Commonwealth Brief at 28.

The parties had previously entered into the Mediated Agreement, due to intervention by state officials, to, *inter alia*, ensure some measure of continued access for enrollees in Medicare Advantage plans to certain UPMC facilities for a limited period of time upon termination of the provider agreements at the end of 2014. The Mediated Agreement required the parties to negotiate in-network rates for this continued access. See Mediated Agreement, *supra.* However, once it became evident to the Commonwealth that the parties would not, on their own initiative, reach a negotiated agreement to accomplish this objective, the record amply supports the conclusion that the Commonwealth, at that point, actively sought an alternative, more viable solution — namely, a comprehensive and judicially enforceable accord which was binding on the parties. In order to ensure that those covered or eligible to be covered by these Medicare Advantage programs, and all other individuals considered vulnerable populations, would have long-term access to UPMC facilities beyond the time periods established by the parties in the provider agreements then in place, the Commonwealth specifically requested that the Commonwealth Court order the parties into a new agreement, and also to provide a mechanism — last best offer arbitration — whereby the rates for such access would be determined if the parties, as anticipated, could not negotiate such rates. Commonwealth Petition for Review, 6/27/14, at 13 (requesting that the Commonwealth Court "[r]equire that respondents reach an agreement for hospital, physician and follow-up services for Highmark members who are part of vulnerable populations, including, but not limited to consumers age 65 and older who are eligible or covered by . . . Medicare Advantage . . . health plans . . . and, failing such an agreement, impose last best offer arbitration"); Commonwealth Petition to Enforce

Consent Decree, 4/27/15, at 7 ("The Consent Decrees, vigorously negotiated and voluntarily executed by [the parties], were designed both in express terms and in concept to protect vulnerable members of the public by providing senior citizens and other care recipients with Highmark insurance to avoid suffering disruptions in their medical care and/or having unavoidable emergency contacts with UPMC"). Consequently, all of the provisions of the Consent Decrees, which, by their terms, were intended to be a settlement of the matters raised by the Commonwealth in its Petition for Review, see Consent Decree at IV(C)(5), to which both parties voluntarily agreed, must be interpreted to effectuate this overarching objective of shielding vulnerable populations from incurring excessive out-of-pocket medical costs, by ensuring their access to UPMC facilities on an in-network basis, even after specific provider contracts covering these populations were terminated, and that the scope of this protection was specifically intended to extend to those individuals participating in Medicare Advantage plans, and intended to last at least as long as the life of the decree.

The vulnerable populations clause is the **only** clause in the Consent Decrees affording vulnerable populations this cost containment protection, by setting forth the specific contractual obligations of the parties with respect to their medical treatment. The first sentence specifies that "vulnerable populations include: (i) consumers age 65 or older who are eligible or covered by Medicare, Medicare Advantage . . . ." Consent Decree IV(A)(2). Thus, this introductory sentence furthers the central purpose of the Consent Decrees, by establishing that all those covered, or eligible to be covered, by Medicare Advantage plans are to be afforded all of the protections conferred by the vulnerable populations clause. The remaining sentences in this clause must, therefore, be read together with this introductory sentence, and, also, in a manner which is consistent with the central purpose of the Consent Decrees. Pritchard; Murphy.

Turning to the second sentence of the vulnerable provisions clause, Medicare Advantage is not enumerated within its list of other plans which provide medical insurance to vulnerable populations such as CHIP and Highmark Signature 65. However, this fact alone does not exclude those individuals participating in Medicare Advantage from the protections of the vulnerable populations clause.[19] Indeed, there is no element of the second sentence which restricts the coverage of this clause to **only** those individuals participating in plans enumerated in the second sentence; thus, by its terms, the second sentence does not **preclude** protection for Medicare Advantage participants from being addressed elsewhere in the clause. This is, in fact, entirely consistent with the separate manner in which the parties previously treated these various plans in the Mediated Agreement. In that agreement, one provision addressed Medicare Advantage, whereas another addressed separate plans covering vulnerable populations, such as CHIP. See Mediated Agreement, supra.

Therefore, as the parties presently acknowledge, since Medicare Advantage plans are not covered by the second sentence of the vulnerable populations clause, the central question is whether the terms "Medicare participating consumers" in the third sentence may be interpreted to afford protection to individuals in those plans. As Judge Pellegrini recognized, the phrase "Medicare participating consumers" is not defined

---

[19] As indicated supra, Highmark President Rice-Johnson testified that the purpose of removing Medicare Advantage from the second sentence of the vulnerable populations clause was to ensure that when Highmark offered its then new Community Blue Medicare Advantage program it would not be accused by UPMC of being in violation of the decree. N.T. Hearing, 5/27/15, at 210-11. However, she indicated that she did not consider that deletion to relieve UPMC of its obligation to contract with Highmark for those in its existing Medicare Advantage programs, which she viewed the third sentence of the clause to require. Id. at 214-15. This uncontroverted evidence of record buttresses our conclusion that Highmark did not intend, through this deletion, to exclude those in its existing Medicare Advantage programs from the coverage of the vulnerable populations clause.

anywhere in the Consent Decree, nor does the introductory portion of this sentence use the terms "Medicare" or "Medicare Advantage," standing alone, as was done in the first sentence. This reasonably suggests, then, that this phrase may not be restricted to apply to either of those two programs individually.

Accordingly, Judge Pellegrini properly resorted to the consideration of extrinsic evidence on this question, which was furnished through the testimony taken at the hearing held in this matter, and the exhibits submitted by the Commonwealth from the federal government's Medicare website. Based on this evidence, Judge Pellegrini found that the terms "Medicare participating consumers" were intended to broadly include participants in both the Medicare and Medicare Advantage programs referred to in the first sentence of the vulnerable populations clause. Commonwealth Court Opinion, 6/29/15, at 28. As this construction is reasonably supported by the evidence, which we discuss below, we are bound by it.

The overall statutory structure of the Medicare program has been succinctly described by the Third Circuit Court of Appeals, thusly:

> The Medicare Statute divides benefits into four parts. Part A, "Hospital Insurance Benefits for Aged and Disabled," and Part B, "Supplementary Medical Benefits for Aged and Disabled," create, describe, and regulate traditional fee-for-service, government-administered Medicare. §§ 1395c to 1395i–5; §§ 1395–j to 1395w–5. Part C, inserted with the passage of the Balanced Budget Act of 1997, Pub. L. 105–33, creates the program now known as Medicare Advantage, which allows for the creation of MA plans . . . Finally, Part D provides for prescription drug coverage for Medicare enrollees. § 1395w–101 to –154.

In re Avandia Mktg., Sales Practices & Products Liab. Litig., 685 F.3d 353, 357 (3d Cir. 2012). This explication supports the legal conclusion, advanced by the Commonwealth, that Medicare Parts A, B, and C are statutorily treated as component parts of the overall Medicare program, but serve the same common purpose of providing health insurance

coverage to aged and disabled individuals.[20]  Most saliently, however, is the fact that this interpretation of the function of Parts A, B and C, was further confirmed by the previously described testimony of Sampson, a Pennsylvania Department of Aging official with particular familiarity with the Medicare program due to her personal experience in administering the Apprise program servicing elderly populations, and who conducts educational training on issues relating to elderly health care.  Critically, both Sampson's testimony, as well as the official materials from the federal agency which administers the Medicare program, CMS, establish that, in the view of the federal government, if an individual is enrolled in Medicare Advantage program, that individual is still considered to be **in** the federal Medicare program.  As such, a person who is enrolled in Medicare Advantage receives their Medicare Part A and B benefits through the Medicare Advantage program.  See N.T. Hearing, 5/27/15, at 41-66; Commonwealth's Exhibit 2, "13 things to know about Medicare Advantage Plans," https://www.medicare.gov/sign-up-change-plans/medicare-health-plans/medicare-advantage-plans/things-to-know-medicare-advantage-plans.html ("1. You're still in the Medicare Program. 2. You still have Medicare rights and protections. 3. You still get complete Part A and Part B coverage through the plan.").  Consequently, we conclude that the Commonwealth Court's findings that enrollees in Highmark's Medicare Advantage plans are properly considered participants in the Medicare program, and are,

---

[20] Contrary to UPMC's suggestion, a Medigap policy is fundamentally different from Medicare Parts A, B and C, as it is designed to pay the difference in costs between the amounts paid under Parts A and B of Medicare for medical care; hence, it is unremarkable that Medigap is provided for separately under the second sentence of the vulnerable populations clause. See "What's Medicare Supplement Insurance (Medigap)?," https://www.medicare.gov/supplement-other-insurance/medigap/whats-medigap.html ("A Medigap policy is different from a Medicare Advantage Plan. **Those plans are ways to get Medicare benefits,** while a Medigap policy only supplements your Original Medicare benefits." (emphasis added)).

therefore, included within the ambit of "Medicare participating consumers," in the third sentence of the vulnerable populations clause, are amply supported by the record.

We reject UPMC's contention that "Medicare participating consumers" can only be understood to refer to those individuals in Medicare Part A and B because the latter part of the third sentence of the vulnerable populations clause states, "regardless of whether [Medicare participating consumers] have Medicare as their primary or secondary insurance." Consent Decree, § IV(A)(2). As noted by Judge Pellegrini, the third sentence of the Consent Decree explicitly obliges UPMC to treat all "Medicare participating consumers" as "In-Network." Id. The Consent Decree defines "In-Network," in relevant part, to mean "where a Health Care Provider has contracted with a Health Plan to provide specified services for reimbursement at **a negotiated rate** to treat the Health Plan's members." Consent Decree, II(I) (emphasis supplied). As Highmark President Rice-Johnson's testimony at the hearing established, which was not otherwise disputed, there is no negotiation between the federal government and a health care provider who agrees with the federal government to become a participating provider in Part A and B of the Medicare program. The provider must accept the participating provider rates paid by CMS. Thus, as Judge Pellegrini found, if the phrase "Medicare participating consumers" is restricted to only those participants in Medicare Parts A and B, the Consent Decree would purport to allow negotiation of those rates, even though such rates are determined by CMS and not subject to negotiation under federal law. Such an interpretation would, therefore, be illegal as Judge Pellegrini determined. Since we do not countenance the interpretation of a contract which would render it illegal or incapable of performance, but, rather, construe a contract to give legal effect to every provision therein, we likewise refuse to interpret the third sentence in this manner. Murphy; see also Restatement of Contracts (2d) § 203(a) ("an

interpretation which gives a reasonable, lawful, and effective meaning to all [contractual] terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").[21]

While it is true, as UPMC argues, that, as a general rule of interpretation, a term in a contract which is first used in a particular manner in the contract is usually given the same meaning throughout the remainder of the contract, this maxim is not absolute, and it must yield in the face of countervailing indications. Maloney; 11 Williston on Contracts § 32:6 (4th ed.). Here there are strong countervailing reasons not to restrictively interpret the term "Medicare," as used in the third sentence, to apply only to Medicare Part A and B, since that would annul the first sentence of the vulnerable populations clause which expressly designates those individuals covered by Medicare Advantage as a separate vulnerable population from those covered by Medicare Part A and B. Moreover, and most importantly, such an interpretation would have the effect of contravening the purpose of the Consent Decrees by entirely excluding those seniors participating in Medicare Advantage plans from the "in-network" cost containment

---

[21] As Judge Pellegrini found, this construction is consistent with his October 29, 2014 decision which dealt with the separate question of Highmark's duty to under the vulnerable population's clause, i.e., whether **Highmark** was obligated to include UPMC as an in-network provider under the vulnerable population clause for its then-newly offered Community Blue HMO plan. As indicated above, Judge Pellegrini concluded in his October 29, 2014 opinion that the language of the third sentence — i.e., "UPMC shall treat all Medicare participating consumers as In-Network," imposes a duty on **UPMC** to treat those consumers as "In-Network," but this same language, which also appears in the vulnerable populations clause of Highmark's Consent Decree, does not impose a corresponding obligation on Highmark.

protections established by the Consent Decrees, even though the record compels the conclusion that these individuals were specifically intended to be protected.[22]

Instead, we construe the operation of the second and third sentences of the vulnerable populations clause as functioning in a manner that is consistent with the core purpose of the Consent Decree — namely, that they work in tandem to provide contractual protection to all vulnerable populations described in the first sentence of the clause. The second sentence requires that "UPMC shall continue to contract with

---

[22] Although UPMC insists that the third sentence of the vulnerable populations clause must be read **only** as a coordination of benefits clause that functions when a member of a vulnerable population has Medicare Part A and B coverage, and also has commercial, employer provided group health insurance, we are unpersuaded by this suggested restrictive construction, given that, again, this would necessitate us to interpret the first part of the third sentence of the vulnerable populations clause as requiring those Medicare Part A and B consumers to be "In-Network," and, thus, mandating the illegal and impossible negotiation of rates for Medicare Part A and B coverage. Additionally, inasmuch as some of the commercial provider contracts between Highmark and UPMC were not covered by those decrees and, ultimately, expired at the end of 2014, see Motion to Enforce Consent Decree, 4/27/15, at 3, it would be illogical under such circumstances to construe this provision as being **solely** intended to govern the coordination of Medicare Part A and B benefits with benefits which would no longer be payable upon expiration of those commercial contracts. Likewise, as the Consent Decree is only intended to establish the contractual obligations of Highmark and UPMC for its duration, it would be incongruous to construe the sole purpose of this sentence to be a coordination of benefits clause between Medicare Part A and B benefits and benefits payable under commercial health insurance policies offered by insurers who are not parties to the decree.

Moreover, and most importantly, we note that interpreting "Medicare participating consumers" as including those enrolled in Medicare Advantage plans, or eligible to be enrolled, would not prevent this clause from operating to coordinate benefits for those who also have employer based commercially purchased health coverage. Medicare Advantage can function as either primary or secondary coverage in such circumstances, see 42 U.S.C. § 1395w-22(a)(4) (setting forth authority of Medicare Advantage organizations to act as secondary payers); 42 C.F.R. § 422.108, (enumerating Medicare Advantage secondary payer procedures), and the clause would, then, operate to require the rates paid by the Medicare Advantage plan for its members, as either the primary or secondary payer, to be "In-Network," and, therefore, established by either negotiation or arbitration under the provisions of the consent decree.

Highmark at in-network rates for all of its hospital, physician and appropriate continuity of care services for CHIP, Highmark Signature 65, Medigap and commercial retiree carve out as long as Highmark does not make unilateral material changes to these programs." Consent Decree, § IV(A)(2). The third sentence, while not using the same "continue to contract" terminology, nevertheless obliges UPMC to treat those participants in Highmark Medicare Advantage programs as "In-Network," and, thus, requires it have a contract with Highmark that establishes negotiated rates for treatment of those in Medicare Advantage programs for which Highmark currently has provider contracts with UPMC, or, if negotiations are fruitless, then such rates will be set by arbitration under Section IV(C)(1)(a)(iii) of the Consent Decree.

Accordingly, as the vulnerable populations clause specifically governs the parties' continuing obligations under the Consent Decree with respect to Medicare Advantage participants for the time period that it covers — i.e., from the time of the entry of the decrees until 2019 — this provision is not, as UPMC contends, superseded by the provision in the introductory paragraph of the decree which provides that the decrees are not "a contract extension." Consent Decree I(A). Given the circumstances surrounding the entry of the decrees, and construing this prefatory language in conjunction with the vulnerable populations clause, the introductory admonition that this is not a contract extension must be understood as only pertaining to the contracts between the parties which existed prior to the effective date of the Consent Decree — i.e., the Medicare Advantage provider agreements in effect at the time of the entry of the Consent Decree which are now due to be terminated on December 31, 2015 — and it forecloses the automatic annual renewal of those contracts. However, it does not relieve UPMC of the duty to perform its separate obligations imposed by the vulnerable populations clause, which independently require it to treat as in-network all those

participating in Highmark's Medicare Advantage plans, which are subject to the existing and soon to be terminated provider agreements. Certainly, in order to comply with the requirements of the vulnerable population clause, UPMC **could** agree to continue these existing provider agreements under their terms after their expiration on December 31, 2015, since they already furnish participants in Highmark's Medicare Advantage plans with in-network access to UPMC facilities; however, it has elected not to take this route.

Thus, despite UPMC's termination of the existing Medicare Advantage provider agreements as of December 31, 2015, the vulnerable populations clause still obligates UPMC to treat participants in Medicare Advantage plans governed by those provider agreements as "In-Network" for the period January 1, 2016 forward, and the rates for such treatment will be determined as specified by Section IV(C)(1)(a)(iii) of the Consent Decree. Absent such agreement between the parties on rates, the Consent Decree provides for binding arbitration to settle the matter. Id. Consequently, as Judge Pellegrini's order, directing UPMC to be "in a contract," and for UPMC to be an "in-network" provider for Highmark Medicare Advantage plans because of UPMC's termination of the Medicare Advantage provider agreements, confirms these obligations, we affirm it in this regard.[23]

### III. Issue Two

UPMC next argues that, regardless of its obligations under the vulnerable populations clause, it was, nevertheless, entitled to escape from the obligations

---

[23] Because UPMC's termination of the existing Medicare Advantage provider contracts does not relieve UPMC of its separate contractual obligations created by the vulnerable populations clause, the issue of whether Highmark made "admissions" that UPMC had the right to terminate its existing Medicare Advantage provider contracts at any time is irrelevant.

imposed by the vulnerable populations' under the fourth sentence of that provision, because Highmark, after the execution of the Consent Decree, took certain positions in which it claimed the unilateral right to adjust its fee schedules under the Medicare Advantage agreements. Specifically, UPMC claims that Highmark took this position: in the complaint regarding the rates it paid UPMC for oncology drugs it filed in the Allegheny County lawsuit; in a pleading filed on July 9, 2015 in the AHLA arbitration proceedings; in a letter Highmark sent to UPMC on March 13, 2015, in response to UPMC's notice to Highmark of its material breach; and in an interview in a Medicare Advantage journal. UPMC claims that this "take the position clause" encompasses all of these statements since, in its view, that clause has no temporal restriction and "applies equally to past, present, and future contracts." UPMC Brief at 58.

Highmark denies that it took any position under the fourth sentence of the vulnerable populations clause which would trigger UPMC's right to escape its obligations under the Consent Decree. Highmark avers that, to the contrary, since the time of the entry of the Consent Decree, it has consistently taken the position, as reflected in the aforementioned trial testimony of Rice-Johnson, that it considers itself bound by the rate terms of the Consent Decree, and that, from the time of the entry of the decree forward, it repeatedly averred that it would not change any rates unless it was agreed upon by both parties or arbitrated. Highmark argues that the record reflects it has adhered to this understanding of the scope of the Consent Decree and contends that any actions it took regarding the disputed fees for the oncology drugs, and any public statements related to its right to reimbursement, were regarding the pre-Consent Decree provider agreements between it and UPMC — i.e., the Medicare Advantage provider agreements which renewed before the entry of the Consent Decree on April 1, 2014, and which UPMC is terminating as of December 31, 2015. Highmark argues that

the Consent Decree cannot reasonably be read as curtailing its rights to take positions on matters which occurred prior to its entry.

The Commonwealth agrees with Highmark's interpretation that this "escape clause" is forward looking in nature, and applies only to actions which Highmark took after the entry of the decree. The Commonwealth defends Judge Pellegrini's interpretation of this sentence as not prohibiting Highmark from challenging the pre-Consent Decree action it took to change the oncology fee schedule prior to the April 1, 2014 renewal deadline. The Commonwealth proffers that it would be absurd to allow UPMC to escape the Consent Decree by citing actions Highmark took before its entry, as such an interpretation would allow UPMC to unilaterally exit the Consent Decree at any time, rendering it an illusory and unenforceable agreement.

The relevant sentences of the vulnerable populations clause pertaining to this issue, sentences 3 and 4, provide:

> UPMC shall treat all Medicare participating consumers as In-Network regardless of whether they have Medicare as their primary or secondary insurance. UPMC reserves the right to withdraw from these arrangements if Highmark should take the position that it has the authority to revise the rates and fees payable under those arrangements unilaterally and materially.

Consent Decree § IV(A)(2). As we have discussed, the third sentence of the vulnerable populations clause, set forth above — that "UPMC shall treat all Medicare participating consumers as In-Network" — requires that UPMC and Highmark maintain a contractual relationship which sets "In-Network" reimbursement rates for medical treatment provided to participants in Highmark's Medicare Advantage plans. Consequently, we read the phrase "these arrangements" appearing in the very next sentence as referring to this contractual relationship.

Correspondingly, then, we must construe the phrase "if Highmark should take the position that it has the authority to revise the rates and fees payable under those arrangements unilaterally and materially" to refer to a situation where Highmark takes the position that it has the right to unilaterally and materially change the rates and fees payable to UPMC under the Medicare Advantage plans. We find this phrase to be unambiguous. The phrase's use of the words "if Highmark should take the position" denotes a conditional future occurrence; thus, as Highmark and the Commonwealth argue, this condition was intended to prospectively apply, from the time of the entry of the decree forward. In other words, it is triggered if Highmark should take the position that it has the right to unilaterally alter the rates and fees it pays to UPMC for patient care under the Medicare Advantage agreements from the date of entry of the Consent Decree through its termination.

Highmark clearly believed that it had the right in April 2014, prior to the entry of the Consent Decrees, to unilaterally change the oncology fee schedules it was paying under the Medicare Advantage provider agreements in effect at that time, and which renewed for 2015. This belief is reflected in the various documents referred to by UPMC in its brief, which all contain assertions by Highmark and its management personnel that it was justified in making that alteration to the fee schedules **in 2014** under the terms of those agreements. However, the record supports the Commonwealth Court's conclusion that Highmark did not consider itself to possess the right to take such unilateral action once the Consent Decrees were entered. To the contrary, the record reflects the Commonwealth Court's conclusion that Highmark consistently disavowed that it had any such right under the Consent Decree to make

such changes, and it considered the decree's specified mechanisms for setting rates for its Highmark Advantage plans, i.e., negotiations and arbitration, to be controlling.

Highmark's stance on this subject is best reflected by Rice-Johnson's testimony at the hearing in the Commonwealth Court: "Once we entered into the arrangement with the Consent Decrees, that limited our ability to [change fee schedules]. So during the period of the Consent Decree forward, we will not change rates unless they are mutually agreed upon or agreed upon through arbitration." N.T. Hearing, 5/27/15, at 186. Judge Pellegrini credited this testimony in finding the express terms of the Consent Decrees specifically account for, and explicitly recognize Highmark's right to seek, resolution of the pre-Consent Decree dispute over oncology drug reimbursements. See Consent Decree, § IV(C)(1)(a)(i)(ii) (referring to "rates currently being arbitrated" by UPMC and Highmark). Consequently, we affirm the Commonwealth Court's conclusion that UPMC may not seek release from the Consent Decree based upon conduct by Highmark that specifically was permitted by the Consent Decree.

## IV. Issue Three

Finally, UPMC attacks, as an alleged denial of due process, paragraph 3 of Judge Pellegrini's order, which bars both UPMC and Highmark from making "any changes to any Plan, contract, or other business relationship between UPMC and Highmark . . . no matter how small, without first securing approval from the Court," and paragraph 4 of his order, which states "[t]he Commonwealth will file a request for supplemental relief to effectuate compliance with the consent decrees, including but not limited to, changes in corporate governance." Order, 5/29/15, at 3. UPMC claims that it was given no notice that such relief could be entered during the proceedings below, as

it was not requested by the Commonwealth in its motion to enforce the decrees. Further, UPMC argues that the Commonwealth Court had no jurisdiction to supervise the private business interactions between these two parties, as its jurisdiction was limited to resolving matters arising under the Consent Decree only; nor, it claims, did the Commonwealth Court have original jurisdiction to hear issues relating to changes in corporate governance, as such matters are within the original jurisdiction of the Orphans' Court Division of the Courts of Common Pleas.

Highmark responds that UPMC mischaracterizes paragraph 3 of Judge Pellegrini's order, inasmuch as paragraph 3 encompasses only matters covered by the Consent Decree, over which the Commonwealth Court, by the terms of that decree, retains jurisdiction to resolve. The Commonwealth, for its part, suggests that UPMC's appeal should be quashed under our Court's decision in Rae v. Funeral Directors Association, 977 A.2d 1121 (Pa. 2009), in which our Court ruled that, in situations where there is an order of a lower tribunal containing multiple parts, and one part of the order meets the three-pronged test allowing for immediate appeal as a collateral order under Pa.R.A.P. 313, the remaining parts of the order are not subject to appellate review unless each of those parts independently meet the three-pronged test as well. While the Commonwealth acknowledges that Judge Pellegrini's order is not collateral, but instead, views it as interlocutory since it contemplates further proceedings in the trial court, the Commonwealth asserts that we should, nevertheless, apply the rationale of Rae and quash the portion of UPMC's appeal dealing with paragraphs 3 and 4 of Judge Pellegrini's order.

Our review of paragraph 3 of Judge Pellegrini's order compels us to conclude that it is prohibitory in nature, in that it bars both parties from taking any further action which would alter their business relationships without obtaining approval from the Commonwealth Court. Thus, contrary to the Commonwealth's suggestion, this paragraph constitutes a form of injunction. See Levin v. Barish, 481 A.2d 1183, 1187 (Pa. 1984) ("An injunction is a court order prohibiting or commanding virtually any type of action."). As such, it is an interlocutory order immediately appealable as of right under Pa.R.A.P. 311(4). See supra note 15. Thus, we will not quash UPMC's appeal of this part of the order.

However, as Judge Pellegrini explained in his opinion, the scope of this order is limited to precluding UPMC and Highmark from altering their business relationships or contracts "that involve matters within the scope of the consent decrees." Commonwealth Court Opinion, 6/29/15, at 35. Consequently, we conclude that Judge Pellegrini's order, when viewed in this circumscribed fashion, is authorized by the Consent Decree, inasmuch as the parties agreed therein that the Commonwealth would "have exclusive jurisdiction to enforce the Consent Decree" before the Commonwealth Court. Consent Decree, § IV(C)(4). Moreover, we note that this section also affords ample due process protections by spelling out mandatory notice provisions which must be provided to a party before any formal enforcement action may be taken against that party in the Commonwealth Court, and it requires the party be afforded the opportunity to cure any violation under the agreement prior to enforcement action being taken. Id. In addition, if formal enforcement action is later taken in the Commonwealth Court, both parties are given the opportunity, as they were here, to present evidence and have their

respective positions considered.  Id.  We, thus, affirm this portion of Judge Pellegrini's order.

Likewise, we consider the fourth paragraph of Judge Pellegrini's order to be in the nature of an injunction, since it is a mandatory directive to the Commonwealth that it "**will** file a request for supplemental relief to effectuate compliance with the consent decree."  Commonwealth Court Order, 5/29/15, at 3 (emphasis added).  Accordingly, because the order commands the Commonwealth to undertake a specific future action, we consider this portion of Judge Pellegrini's order to constitute an interlocutory order appealable as of right under Pa.R.A.P. 311(4).  Levin.

Even so, we find that this issue is not yet ripe for our adjudication.  Generally speaking, as our Court has previously articulated, "the doctrine of ripeness concerns the timing of a court's intervention in litigation."  Philadelphia Entm't & Dev. Partners, L.P. v. City of Philadelphia, 937 A.2d 385, 392 (Pa. 2007).  This jurisprudential doctrine seeks to avoid having our court prematurely adjudicate a controversy, and thereby become entangled in resolving an abstract or hypothetical issue, whenever no party has, yet, suffered a concrete harm which could be alleviated through appellate review.  Id.  When determining whether a matter is ripe for judicial review, our Court will "generally consider whether the issues are adequately developed and the hardships that the parties will suffer if review is delayed."  Bayada Nurses, Inc. v. Com., Dep't of Labor & Indus., 8 A.3d 866, 874 (Pa. 2010).  Presently, the Commonwealth has not taken any enforcement action under this paragraph of Judge Pellegrini's order, nor, as it indicated in its brief, is it contemplating any at this time.  Hence, were we to opine regarding whether the **potential** exercise of this power by the Commonwealth is lawful, we would

be rendering an advisory opinion. Inasmuch as neither party is, at present, suffering harm from this provision of Judge Pellegrini's order, we conclude that UPMC's challenge to it is not ripe for review at present. We, therefore, quash this portion of UPMC's appeal. See Brown v. Commonwealth Dept. of Health, 434 A.2d 1179, 1181 (Pa. 1981) (quashing appeal raising claims which were "premature").

Order affirmed in part, quashed in part. Jurisdiction relinquished.

Mr. Chief Justice Saylor and Mr. Justice Eakin join the opinion.

Mr. Chief Justice Saylor files a concurring opinion.

Mr. Justice Baer files a concurring and dissenting opinion in which Mr. Justice Stevens joins.