J-A21018-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ZITO MEDIA, L.P., | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DELOITTE & TOUCHE, LLP | : | No. 3033 EDA 2018 |

Appeal from the Order Entered September 6, 2018
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  06280 March Term, 2004

BEFORE:  BOWES, J., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OLSON, J.:                              March 25, 2020

Appellant, Zito Media, L.P., appeals from the order entered September 6, 2018, granting Deloitte & Touche, LLP's ("Deloitte") motion for summary judgment.  We vacate and remand.

The factual history has been summarized as follows:

[I]n 1952, John Rigas purchased a cable television franchise for the small town of Coudersport, Pennsylvania.  Over the next thirty years, John [Rigas] acquired additional cable companies.

In 1985, John [Rigas] hired Deloitte to provide him and his companies with accounting and auditing services.  John [Rigas] ran the companies with his sons[,] James [Rigas], Timothy [Rigas], and Michael [Rigas].  In July 1986, they reorganized five of the companies into a single holding company, Adelphia [Communications Corporation ("Adelphia")], which they subsequently took public.  Rigas family members (including John [Rigas], James [Rigas], Timothy [Rigas], Michael [Rigas], and members of their immediate families) retained voting control over Adelphia.  The family privately owned another set of companies (the "Managed Entities") that Adelphia managed for a fee:

[including Coudersport Television Cable Company, Inc. ("Coudersport")]. [Coudersport's] assets eventually were transferred to Zito Media.[FN 2] None of the Managed Entities had any employees. In addition, the Rigas family held partnerships (the "Rigas Family Partnerships" or "RFPs") that owned interests in the Managed Entities and in Adelphia securities.

[FN2] It appears that Zito Media does not own any assets other than those transferred by [Coudersport].

**Island Partners, Inc., et al. v. Deloitte & Touche, LLP**, 2017 WL 4862765, *11-12 (Pa. Super. October 27, 2017) (unpublished memorandum) (citations to record omitted).

Deloitte began providing services to Adelphia and its affiliates in the 1980s, but the audit services that form the basis for this lawsuit were provided between 1996 and 2002. In 1996, as part of its growth plan as a cable TV operator, Adelphia and several related entities, including Coudersport, entered into the first of several Co-Borrowing debt agreements, which are described by one of [Zito Media's] expert witnesses, [] as follows:

An element of Adelphia's approach to continually source financing involved the use of Co-Borrowing debt agreements with various bank syndicates whereby certain Adelphia subsidiaries and [RFP's] would be grouped as the borrowers. The first Co-Borrowing group credit facility [involving Zito Media's predecessor Coudersport] was established February 28, 1996, as amended March 29, 1996, for the amount of $200,000,000. []The banks' Co-Borrowing agreements required the submission of audited combined financial statements for each of the respective Co-Borrowing groups. As a result, Deloitte's scope of audit services expanded as the firm was engaged to perform audits of each of the separate Co-Borrowing groups' combined financial statements.

According to [Zito Media's] liability expert []the significant Co-Borrowing debt incurred by Adelphia-related entities should have been treated differently than was done in the audits Deloitte performed for the Adelphia entities for fiscal years 1996-2001:

In order to finance business activity, a basic concept is that of a single company borrowing funds via a term loan or a line of credit facility with a single bank. In a direct and straightforward process, the single company records receipt of the borrowed funds and thereafter makes payments on the outstanding balance pursuant to terms of the loan agreement. The balance of the bank debt outstanding is then reported as a financial statement element in the company's balance sheet at any point in time for a specific report date (*i.e.* - December 31st) with typical reference such as note payable or long-term debt.

The Co-Borrowing bank debt reported as an element of the Adelphia and Co-Borrowing group['s] financial statements was not of a nature having the direct one-to-one single company to single bank relationship. In each instance, it involved several Adelphia subsidiaries and [RFPs] put together as a Co-Borrowing group and several banks put together as a syndicate to provide the loan or credit facility. The arrangement was different and more complex than the basic one-to-one scenario. Deloitte audit engagement staff however, viewed the Co-Borrowed debt no differently than other bank debt of Adelphia and the Co-Borrower groups. Deloitte failed to consider or chose to ignore that the Co-Borrowing debt was different in substance [than] the other bank debt.

Based upon the expert's review of Deloitte work paper documents available in this matter, it is evident that the framework for the Adelphia audit work remained generally consistent over seven financial statement audit reporting dates from 1996 through 2001 particularly with respect to Co-Borrowing bank debt.

Despite the new Co-Borrowing agreement entered into [on] March 29, 1996, [which, again, featured multiple Adelphia-related borrowers securing funds from multiple bank participants in the credit facility,] there is no mention of its occurrence in the Audit Planning Memo or the Audit Summary Memorandum. There is also no mention of any risk regarding off balance sheet debt. The initial 1996 audit is what served as the basis for Deloitte's performance on each subsequent audit up to March 27, 2002. Deloitte's Co-Borrowed debt accounting determination was that the joint and several liability provision was a contingent liability

akin to a guarantee of the indebtedness of other Co-Borrowers. Therefore[,] the contingency was not to be recorded on Adelphia's books, but only disclosed in the financial statements.

Deloitte's understanding included a view that the Co-Borrowing arrangements allowed "the Co-Borrowers to determine" who was the particular borrower with respect to the allocation of debt reflected on the respective Co-Borrower's financial statements. This view is striking considering the nature of the Co-Borrowing debt structure and related accounting process maintained and/or controlled by Adelphia. For example, Deloitte admits knowledge no later than 2000 that "co-borrowed debt originally recorded on one co-borrower's books was moved -- or 'reclassified' -- to another co-borrower's books." Deloitte also admits knowledge no later than 2000 that Co-Borrowed funds were used to acquire Adelphia stock. Such factors should have been red-flags to the Deloitte engagement team.

Fiscal Year 2001 was the second time that [Zito Media's] predecessor, Coudersport, was a Co-Borrower, and the amount of the 2001 Co-Borrowing credit facility was over $2 billion. When Deloitte undertook the [Fiscal Year ]2001 audit in early 2002, it apparently proceeded in the same manner as it had in prior years until late March[] 2002, when the SEC began to ask questions about Deloitte's "audit performance regarding Co–Borrowing debt."

Adelphia issued an earnings press release on March 27, 2002[,] reporting its "Full Year 2001 Results," which was reviewed by Deloitte beforehand. Adelphia was left with the understanding that the audit was substantially complete but for some miscellaneous closing items. Adelphia also held a conference call with investors and analysts the same day. We understand the press release included for the first time an explicit disclosure of the amount of Co-Borrowing debt outstanding[, but] not recorded on Adelphia's balance sheet. There appears to be no dispute in this matter that after the press release, the stock market reacted negatively to the Co-Borrowing debt information and Adelphia's stock value dropped.

At that point, Deloitte apparently refused to issue an audit similar to the ones it had issued in past years, so "Adelphia and the Co-Borrowing groups were left unable to file their financial reports by the respective April 1, 2002, and April 30, 2002 deadlines." Adelphia and its affiliates sought bankruptcy protection and [John Rigas and Timothy Rigas] were convicted of fraud in connection with their management of Adelphia and related companies, including the incurrence and treatment of the Co-Borrowing debt.

Trial Court Opinion, 9/6/18, at 2-5 (footnotes, original brackets and ellipses omitted).

Procedurally, Appellant filed suit in the Court of Common Plea of Philadelphia County ("trial court") against Deloitte in 2004, alleging, *inter alia*, breach of contract, professional negligence, and negligent misrepresentation. Deloitte removed the case to the United States Bankruptcy Court for the Eastern District of Pennsylvania due to the relationship the case had with Adelphia's, and its affiliates', pending bankruptcy. A federal Judicial Panel on Multidistrict Litigation transferred the case to the United States District Court for the Southern District of New York ("district court") as part of the multidistrict litigation relating to the collapse of Adelphia and its affiliates. In June 2013, Appellant filed an amended complaint with the district court. Deloitte filed a motion for summary judgment that the district court granted, in part, with regard to Appellant's breach of contract claim and denied, in part, as to Appellant's professional negligence and negligent misrepresentation claims. ***In re Adelphia Communications Corp. Sec. and Derivative Litig.***, No. 03 MDL 1529 (JMF), 2013 WL 6838899, at *13 (S.D.N.Y. December 27, 2013) (unpublished opinion).

Upon Appellant's filing of a second amended complaint with the district court, Deloitte filed a motion for summary judgment arguing Appellant's claims were barred by the doctrine of *in pari delicto*. ***Id.***, 2014 WL 6982140, at *10 (S.D.N.Y. December 10, 2014) (unpublished opinion). The district court denied the motion and transferred the case back to the trial court. ***Id.*** at *11.

Deloitte, thereafter, successfully moved for summary judgment with the trial court on the ground that Appellant's expert failed to provide a reasonable calculation of damages. ***Island Partners***, 2017 WL 4862765, at *10. Appellant appealed the trial court's decision, and this Court reversed the order granting summary judgment. ***Id.*** at *11. The case was remanded to the trial court for further proceedings. ***Id.***

On March 26, 2018, Deloitte filed a motion for summary judgment, which is the subject of this appeal. In its motion, Deloitte argued, *inter alia*, that Appellant's claims were precluded as a matter of law by the doctrine of *in pari delicto*. Deloitte's Motion for Summary Judgment, 3/6/18, at 38 ¶ 231. The trial court granted Deloitte's motion for summary judgment on September 6, 2018. Trial Court Opinion, 9/6/18. Appellant filed a timely notice of appeal.[1]

_____

[1] The trial court did not direct Appellant to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). On October 29, 2018, the trial court filed a Rule 1925(a) opinion wherein it relied on its September 6, 2018 opinion and order granting the motion for summary judgment. Trial Court Opinion, 10/29/18.

Appellant raises the following issues for our review:

1. Whether the [trial court] erred by overruling the [district court's] prior rejection of Deloitte's *in pari delicto* defense during multidistrict litigation proceedings?

2. Whether the [trial court] erred on the merits by granting summary judgment to Deloitte based on the *in pari delicto* defense?

3. Whether the [trial court] erred in concluding that one of [Appellant's] two damages theories could not go to a jury?

4. Whether the [trial court] erred in entertaining [a theory] of summary judgment that Deloitte failed to raise in the [district court] during the first round of summary []judgment proceedings, in the [trial court] during the second round of summary []judgment proceedings, or during the previous appeal to this Court?

5. Whether the [trial court] erred in granting summary judgment to Deloitte?

Appellant's Brief at 5.

We begin by addressing Appellant's claim that the trial court erred in granting the motion for summary judgment based on the *in pari delicto* defense in contravention of the coordinate jurisdiction rule, as this issue is dispositive of the appeal.

Our standard of review of an order granting a motion for summary judgment is well settled.

[A]n appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material

- 7 -

fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the [trial court].

*Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010) (citation omitted). "To the extent that [an appellate court] must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record." *Id.*

Appellant argues the trial court, in determining that the *in pari delicto* defense precluded its claims against Deloitte and that Deloitte was entitled to summary judgment, erred because the coordinate jurisdiction rule prohibited the trial court, as the transferee court, from overruling the resolution of this same issue by the transferor district court. Appellant's Brief at 24-25.

"[T]he coordinate jurisdiction rule commands that upon transfer of a matter between trial judges of coordinate jurisdiction, a transferee trial judge may not alter resolution of a legal question previously decided by a transferor trial judge." *Zane v. Friends Hosp.*, 836 A.2d 25, 29 (Pa. 2003), *citing Commonwealth v. Starr*, 664 A.2d 1326, 1331 (Pa. 1995). "Departure from the rule is allowed in exceptional circumstances when there has been a change in the controlling law or where there was a substantial change in the facts or evidence. [A]n exception is permitted where the prior holding was clearly erroneous and would create a manifest injustice if followed." *Zane*, 836 A.2d at 29 (citation and original quotation marks omitted).

Here, the trial court determined that the district court's denial of Deloitte's motion for summary judgment was in error because the district

court "did not take into consideration the fact that Coudersport[, which was the predecessor-in-interest of Appellant,] participated as a co-borrower in the fraudulent borrowing scheme for which John Rigas, Coudersport's sole owner, was convicted" and "did not consider this Commonwealth's 'public interest in relieving [its] courts from lending their offices to mediating disputes among wrongdoers.'" Trial Court Opinion, 9/6/18, at 13 n.43 (brackets in original).

Appellant contends the district court's decision was not erroneous. Appellant's Brief at 26-29. Appellant argues that Coudersport's participation as a co-borrower in the loans was a well-known fact that the district court properly considered. *Id.* at 27-28. Appellant also asserts the district court properly applied Pennsylvania's law of *in pari delicto* and took into consideration the Commonwealth's interests. *Id.* at 28-29.

Deloitte contends that John Rigas's criminal convictions "focused on the accounting of co-borrowing at . . . Coudersport" and that John Rigas, and others, "actively committed fraud on behalf of Coudersport" when he signed management representation letters stating there was no fraud of any kind surrounding the co-borrowing agreements. Deloitte's Brief at 33-34. Deloitte avers that the district court's decision not to impute John Rigas's fraud onto Coudersport was erroneous. *Id.* Deloitte also argues that the coordinate jurisdiction rule did not apply because the case before the trial court was at a different point in the procedural posture than when the case was before the district court and that additional evidence had been presented to the trial court. *Id.* at 28-33.

In determining whether the trial court's order granting summary judgment contravened the coordinate jurisdiction rule, we must examine whether the district court's denial of summary judgment was, in fact, erroneous.

Our Supreme Court in ***Official Comm. of Unsecured Creditors of Allegheny Health Educ. and Research Found. v. PriceWaterhouseCoopers, LLP***, 989 A.2d 313 (Pa. 2010) ("***AHERF***") explained that in order for the *in pari delicto* defense to apply, "Pennsylvania requires the plaintiff be an active, voluntary participant in the wrongful conduct or transaction(s) for which it seeks redress, and bear substantially equal or greater responsibility for the underlying illegality as compared to the defendant." ***AHERF***, 989 A.2d at 329, *citing* ***Bateman Eichler, Hills Richards, Inc. v. Berner***, 472 U.S. 299, 306-307 (1985) (stating, the defense "derives from the Latin, *in pari delicto potior est conditio defendentis*: 'In a case of equal or mutual fault ... the position of the [defending] party ... is the better one.'"). The ***AHERF*** Court stated, "*in pari delicto* serves the public interest by relieving courts from lending their offices to mediating disputes among wrongdoers, as well as by deterring illegal conduct." ***AHERF***, 989 A.2d at 329 (citation omitted). When the plaintiff is a corporation, applicability of the *in pari delicto* defense turns on whether the actions of the corporate principal's agent, who committed the wrongful acts, may be imputed to the corporate principal. ***Id.*** at 330 n.20, 333. "[W]here an agent acts in his own interest, and to the corporation's detriment, imputation generally will

- 10 -

not apply." *Id.* at 333 (explaining, "the imputation doctrine recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority."), *citing* **Todd v. Skelly**, 120 A.2d 906, 909 (Pa. 1956). Further, a corporate principal whose agent has acted for the benefit of the corporation with culpability exceeding that of the defendant will be denied recovery based upon imputation of fraudulent deeds. **AHERF**, 989 A.2d at 336. Absent clear evidence of the agent's wrongdoing, the determination of whether the agent acted in his or her own self-interest to the detriment of the corporate principal or the inquiry into whether the agent's actions benefited the corporate principal are "questions steeped in fact and open to legitimate differences among reasonable minds." *Id.* at 337 (citation omitted).

Here, a review of the district court's opinion demonstrates the district court, recognizing the long history of this case, understood that Appellant, through its predecessor, Coudersport, was one of the Managed Entities and Rigas Family Partnerships, collectively known as RFPs, that were frequently the co-borrowers in the co-borrowing agreements with Adelphia. **In re Adelphia Communications Corp. Sec. and Derivative Litig.**, 2014 WL 6982140, at *1-2, *10. The district court further considered that John Rigas, who wholly owned Appellant's predecessor, Coudersport, was convicted of fraud in connection with the co-borrowing agreements, including those involving Appellant. *Id.* at *10. The district court then considered whether John Rigas's acts of wrongdoing could be imputed to Appellant thereby barring

- 11 -

Appellant's cause of action under Pennsylvania's law of *in pari delicto*; a principle recognizing that no court should lend its hand in aiding a party who grounds its action upon an immoral or illegal act. *Id.* In considering Pennsylvania's law surrounding the *in pari delicto* defense, the district court stated,

> Deloitte may ultimately be able to make [a showing that John Rigas committed the fraud in the course of his employment with Coudersport]—after all, John Rigas was convicted of fraud in connection with his dealings with the Managed Entitie[s] and RFPs, one of which was Coudersport—but, drawing all inferences in [Appellant's] favor, the [district c]ourt cannot say that it has done so sufficiently to grant it summary judgment. At bottom, Deloitte points to little more than the indictment against John Rigas and the jury's verdict in the criminal trial. The indictment, however, is hearsay, and thus not evidence upon which the [district c]ourt can rely.
>
> And while the jury necessarily found that John Rigas engaged in fraud—making application of the *in pari delicto* [defense] against him an easier call—given the general nature of the jury's verdict, **it cannot be said that the jury necessarily found that he did so in his capacity as an officer or sole shareholder of Coudersport as opposed to his capacity as an officer of Adelphia or the other entities.**

*Id.* (citations omitted, emphasis added). Having identified a genuine issue of material fact requiring resolution at trial, the district court determined that Deloitte was not entitled to summary judgment based upon the *in pari delicto* defense. *Id.*

Based upon our review of the district court's analysis as set forth in its opinion, we find the trial court erred in finding that the district court's decision was erroneous. Specifically, the trial court erred in its determination that the

district court failed to consider Appellant was a co-borrower in the co-borrowing agreements that formed a part of John Rigas's fraud conviction, and that the district court was not mindful that the objective of the *in pari delicto* defense was to alleviate judicial mediation of disputes between two wrongdoers. Furthermore, we find no merit to Deloitte's argument that an exception to the coordinate jurisdiction rule existed because there were substantial changes to the facts or in the procedural posture of the case before the trial court.

Under the coordinate jurisdiction rule, the trial court was bound by the decision of the district court that factual issues remained as to whether John Rigas's wrongful actions could be imputed to Appellant and, if imputed, whether John Rigas's wrongdoing exceeded Deloitte's alleged wrongdoing thereby requiring a grant of summary judgment pursuant to the *in pari delicto* defense. Therefore, the coordinate jurisdiction rule precluded entry of summary judgment in Deloitte's favor. Consequently, we vacate the September 6, 2018 order and remand the case for proceedings consistent with this memorandum.[2]

_____

[2] Appellant also claims the trial court erred in concluding that one of Appellant's two theories of damages could not be presented to the jury. Appellant's Brief at 40-43. Appellant argues this Court previously determined that both damages theories could be presented to the jury, and the law of the case doctrine precludes the trial court from altering this Court's previous resolution of that legal question. **Id.** at 41-43; **see also Mariner Chestnut Partners, L.P. v. Lenfest**, 152 A.3d 265, 282 (Pa. Super. 2016) (stating, law of the case doctrine mandates "upon remand for further proceedings, a trial

Order vacated.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

*(signature)*

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>3/25/20</u>

_____

court may not alter the resolution of a legal question previously decided by the appellate court in the matter").

We find this issue not yet ripe for appellate review.  ***Commonwealth ex rel. Kane v. UPMC***, 129 A.3d 441, 473 (Pa. 2015) (stating, doctrine of ripeness seeks to avoid appellate court prematurely adjudicating controversy, thereby becoming entangled in resolving abstract or hypothetical issue, whenever party has yet to suffer concrete harm that can be alleviated through appellate review).

Here, the trial court granted Deloitte's motion for summary judgment on the basis of the *in pari delicto* defense.  In doing so, the trial court remarked that Appellant's first theory of damages (1999 Damages) was the only theory under which Appellant could recover and that Appellant conceded as such.  Trial Court Opinion, 9/6/18, at 7-8, 8 n.25.  Because the September 6, 2018 order does not specifically grant or deny Appellant the right of recovery under one or more damages theories, we find this issue is not yet ripe for appeal.  Nonetheless, a review of this Court's previous decision in this matter demonstrates that this Court held both damages theories are viable means of potential recovery, and the credibility of those theories and the amount of damages suffered by Appellant, if any, are issues for the factfinder.  ***Island Partners***, 2017 WL 4862765, at *34-42.