# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Briar Hill North Association, Inc.      :
                                        :
            v.                          :      No. 934 C.D. 2019
                                        :      Submitted:  May 12, 2020
Joan K. Keil, Individually and in       :
Her Capacity as the Executrix of        :
the Estate of Helen M. Kuzmack,         :
Mary Jo Sanford, Helenann               :
McCloskey, Jeannette K. Murphy,         :
and John A. Kuzmack,                    :
                        Appellants      :


**BEFORE:  HONORABLE P. KEVIN BROBSON, Judge
            HONORABLE CHRISTINE FIZZANO CANNON, Judge
            HONORABLE ELLEN CEISLER, Judge**


*OPINION NOT REPORTED*


**MEMORANDUM OPINION
BY JUDGE BROBSON                     FILED:  July 20, 2020**


Joan K. Keil, individually as a child of Helen M. Kuzmack (Mrs. Kuzmack) and in her capacity as the Executrix of the Estate of Helen M. Kuzmack, along with the other children of Mrs. Kuzmack, Mary Jo Sanford, Helenann McCloskey, Jeannette K. Murphy, and John A. Kuzmack (collectively, Appellants), appeal from an order of the Court of Common Pleas of Wayne County (trial court), dated June 13, 2019.  The trial court granted summary judgment against Appellants in favor of Briar Hill North Association, Inc. (the Association) and awarded unpaid assessments, late fees, and attorney's fees in the total amount of $45,986.79.  For the

following reasons, we affirm in part, reverse in part, and remand this matter to the trial court for further proceedings.

## I. BACKGROUND

The Association is a nonprofit corporation that is responsible for, *inter alia*, the maintenance of the roads and other common areas of the development commonly known as Briar Hill North (the Community), located in Paupack Township, Wayne County, Pennsylvania, on the north shore of Lake Wallenpaupack. Lakeland Associates, Inc. (Developer), the Association's predecessor, acquired the land that comprises the Community in 1952 and subsequently recorded a subdivision plan that created each individual lot in the Community. Appellants own the real property commonly known as Lots 9 and 10-R (collectively, the Properties) in the Community. John A. Kuzmack, Sr. (Mr. Kuzmack), Mrs. Kuzmack's late husband, acquired title to Lot 9 by deed dated September 6, 1957. (Reproduced Record (R.R.) at 26a-28a.) Mr. and Mrs. Kuzmack acquired title to Lot 10-R by deed dated September 27, 1973. (*Id.* at 29a-31a.) Mr. Kuzmack died on March 25, 2009, at which time sole title to the Properties vested in Mrs. Kuzmack, who conveyed the Properties to herself and her children (*i.e.*, Appellants) on February 28, 2012. (*Id.* at 24a-25a.)

The 1957 and 1973 deeds by which Mr. and Mrs. Kuzmack acquired the Properties contain substantially identical uniform covenants (the Covenants), which, *inter alia*, grant the property owner the right to use certain areas of the Community designated for common use, including roads, boat docks, and other facilities. (R.R. at 26a-31a.) Specifically, the Covenants provide, in relevant part:

> [T]he following restriction[s] shall be covenants running with the land.
>
> . . . .

2

> . . . [This deed] . . . conveys the right of ingress and egress over all common area roads in the area and all common use areas set aside by [Developer] for ingress and egress to [Lake Wallenpaupack] and any and all other common use facilities provided with the following restrictions: all property owners using such facilities shall share a proportionate amount of the costs of maintenance . . . .
>
> . . . .
>
> Roads made by [Developer] shall be maintained by the property owners.
>
> . . . .
>
> . . . [T]he use and maintenance of roads and common use facilities shall be the [g]rantee, and users [sic] responsibility and . . . [Developer] shall in no way be held liable for any accidents, damages, or other costs arising from or in the course of using such common use facilities or rights of way . . . .

(*Id.* at 27a-28a, 31a.)

It is undisputed that Mr. Kuzmack, from the time he acquired the Properties until 2009, regularly made payments to the Association representing the Properties' proportionate share of only seasonal road maintenance costs, excluding the costs of winter road maintenance (snow removal and cindering) and costs for items other than road maintenance. (*See* Original Record (O.R.), Item No. 29, ¶ 37; O.R., Item No. 35, Exs. S-ll.) In 2011, the Association began billing Appellants (retroactive to 2009) the standard assessment billed to members of the Association less winter road maintenance costs. (O.R., Item No. 35, Ex. nn.) Appellants did not pay that amount, but they continued to pay a lesser amount representing only nonwinter road maintenance costs. In 2012, the Association began billing Appellants for the standard assessment billed to members of the Association without deduction of any

3

kind. (*Id.*, Ex. qq.) As before, Appellants paid only the lesser amount for nonwinter road maintenance.

The Association filed with the trial court a First Amended Complaint (Complaint) against Appellants for the unpaid portion of the standard Community assessments from 2012 to the present ($2,670.79), late fees ($3,289.00), and attorney's fees and costs. (*See* R.R. at 8a-21a; Notes of Testimony (N.T.), 5/29/19, Exs. P-5, P-8.) The Association's Complaint consists of six counts: (I) Breach of Covenant, (II) Unjust Enrichment, (III) Easement Ownership, (IV) Implied Contract, (V) Uniform Planned Community Act (the Act),[1] and (VI) Common Element Ownership and Use. (R.R. at 8a-21a.) In defense to the Association's claims, Appellants asserted, *inter alia*: (1) they are not members of the Association; and (2) they are obligated to pay only their proportionate share of the Association's seasonal road maintenance expenses because the only common areas in the Community that they use are the roads and they only use such roads from spring through fall. Appellants also asserted the affirmative defenses of collateral estoppel, consent, and estoppel.

Following a period of discovery, the Association and Appellants filed cross-motions for summary judgment. By order dated December 27, 2017, the trial court granted summary judgment in favor of the Association and against Appellants with respect to the Counts of the Complaint for Breach of Covenant (Count I), Easement Ownership (Count III), Uniform Planned Community Act (Count V), and Common Element Ownership and Use (Count VI). The trial court granted summary judgment in favor of Appellants and against the Association with respect to the Association's counts for Unjust Enrichment (Count II) and Implied Contract

---

[1] 68 Pa. C.S. §§ 5101-5414.

(Count IV). Appellants appealed the trial court's order to this Court. By order dated January 9, 2019, we quashed the appeal as untimely. In an attached opinion, we explained that the trial court's grant of summary judgment was interlocutory (and, therefore, not appealable), because it addressed only the issue of liability and did not award damages. *See Briar Hill N. Ass'n, Inc. v. Kuzmack* (Pa. Cmwlth., No. 138 C.D. 2018, filed January 9, 2019), slip op. at 6-7. Following our decision, the trial court held a damages hearing and issued an order on June 13, 2019, awarding damages against Appellants in the amount of $45,986.79.[2] Appellants filed the instant appeal on July 12, 2019.

## II. ISSUES

On appeal,[3] Appellants essentially raise seven issues for our consideration. The first four issues are with respect to Counts I, III, V, and VI of the Complaint. Appellants argue that, on each of those Counts, the trial court erred in granting summary judgment in favor of the Association and implicitly denying Appellants' summary judgment motion. As to the remaining three issues, Appellants argue that the trial court erred in (1) failing to conclude that the Association's claims are barred by the doctrines of consent and estoppel; (2) failing to conclude that the Association's claims are barred by the doctrine of collateral estoppel; and (3) awarding excessive and unreasonable attorney's fees.

---

[2] Mrs. Kuzmack died on January 16, 2019, during the pendency of this matter before the trial court. (O.R., Item No. 72.) On June 13, 2019, pursuant to the parties' joint motion, the trial court issued a separate order substituting for Mrs. Kuzmack the following party: "Joan K. Keil, as executrix of the estate of Helen M[.] Kuzmack." (O.R., Item No. 74.)

[3] This Court's review of a trial court's order granting a motion for summary judgment is limited to considering whether the trial court erred as a matter of law or abused its discretion. *Lambert v. Katz*, 8 A.3d 409, 413 n.3 (Pa. Cmwlth. 2010), *overruled on other grounds by Cagey v. Cmwlth.*, 179 A.3d 458 (Pa. 2018).

# III. DISCUSSION

## A. Summary Judgment

A court may grant a motion for summary judgment "only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Bronson v. Horn*, 830 A.2d 1092, 1094 (Pa. Cmwlth. 2003), *aff'd*, 848 A.2d 917 (Pa. 2004). "The right to judgment must be clear and free from doubt." *Id.* In reviewing the grant of a motion for summary judgment, this Court must "view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Pappas v. Asbel*, 768 A.2d 1089, 1095 (Pa. 2001), *cert. denied*, 536 U.S. 938 (2002).

### 1. Breach of Covenant (Count I)

Appellants first claim that the trial court erred in concluding that they breached a covenant by paying only nonwinter road maintenance costs instead of the full assessment amount billed by the Association. In so concluding, the trial court emphasized that the Covenants convey upon Appellants the right to use and benefit from all common areas in the Community. Accordingly, the trial court, relying on our decision in *Spinnler Point Colony Association, Inc. v. Nash*, 689 A.2d 1026 (Pa. Cmwlth. 1997), reasoned that Appellants are obligated by the Covenants to pay for the maintenance of all common areas (*i.e.*, not limited to roads), regardless of whether they actually use such areas. (*See* Appellants' Br., App. D at 8.)

Appellants argue that the text of the Covenants is not ambiguous and requires payment of their proportionate share of maintenance costs only for the common areas that Appellants actually use. Specifically, they focus on the Covenants' modifying phrase "using such facilities," which, in their view, limits the class of

6

"property owners" who are obligated to pay for any given common facility to just the owners who actually use that facility. (R.R. at 27a-28a, 32a.) Appellants principally argue that the Covenants clearly express only that meaning and that the trial court, therefore, erred in implicitly finding the Covenants ambiguous and further construing their language. In the alternative, Appellants argue that, if the Covenants do require construction, *Spinnler Point* is distinguishable and the trial court erred in construing the Covenants to require payment for common facilities Appellants do not use. Moreover, Appellants maintain that, as a factual matter, they have used only the roads in the Community from spring through fall and not any other common areas, although they acknowledge that the Association has made allegations and adduced evidence to the contrary.

In response, the Association principally relies on the same reasoning as the trial court, emphasizing that the Covenants allow Appellants to use all common facilities in the community—a right for which, in the Association's view, Appellants should pay. In support, the Association cites numerous cases, including *Spinnler Point*, which impose payment obligations on owners despite the absence of any express payment obligation in the covenants at issue. The Association does not address Appellants' textual argument concerning the Covenants, except by asserting, without elaboration, that the Covenants unambiguously require payment of maintenance costs for all common areas and do not refer to "actual[]" use of facilities. (Association's Br. at 32-33, 35.)

In reply, Appellants emphasize that the Association did not squarely address the textual "use[]" issue. Additionally, Appellants explain that, before the trial court, the Association was able to identify only three occasions during their family's nearly 60-year history of ownership on which any family member allegedly used non-road

7

common facilities. Appellants also argue that those three occasions of use all occurred on Community roads at lake access points—roads for which Appellants have always paid their proportionate share of maintenance.

The interpretation of a deed—including covenants contained in a deed—is a question of law for the court. *Starling v. Lake Meade Prop. Owners Ass'n, Inc.*, 162 A.3d 327, 340 (Pa. 2017). "The same principles that apply to the interpretation of a contract apply to the interpretation of a deed." *Id.* at 341. Accordingly, the object of our interpretation is to ascertain and effectuate the intention of the parties, viewing the language of the instrument in its entirety. *In re Conveyance of Land Belonging to City of DuBois*, 335 A.2d 352, 357 (Pa. 1975); *Wilkes-Barre Twp. Sch. Dist. v. Corgan*, 170 A.2d 97, 98 (Pa. 1961) ("[The parties'] intention is to be gathered from a reading of the entire contract."). Where the language of the restrictive covenant is unambiguous, "the intent of the parties should be gained from the writing itself." *Hankin v. Goodman*, 246 A.2d 658, 660 n.1 (Pa. 1968). Covenant language is ambiguous only if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986).

If, and only if, the language of the instrument is ambiguous, "the court must look at the circumstances under which the grant was made" in order to determine what the parties intended. *In re Estate of Quick*, 905 A.2d 471, 474-75 (Pa. 2006) (quoting *Hindman v. Farren*, 44 A.2d 241, 242 (Pa. 1945)). The court may consider circumstances such as "the situation of the parties, the objects they apparently ha[d] in view, and the nature of the subject[ ]matter of the agreement." *Id.* Finally, in any case, an agreement "must be interpreted to give effect to all of its provisions." *Cmwlth. ex rel. Kane v. UPMC*, 129 A.3d 441, 464 (Pa. 2015).

8

The language of the Covenants plainly confers on property owners the right to use "all common area roads . . . [,] all common use areas . . . [,] and all other common use facilities." (R.R. at 28a, 32a.) Just as clearly, the Covenants impose the following condition on that right: "[A]ll property owners *using such facilities* shall share a proportionate amount of the costs of maintenance." (*Id.* (emphasis added).) We agree with Appellants that the phrase "using such facilities" must be read to restrict payment obligations to owners who actually use certain common facilities. This is true notwithstanding that the Covenants do not use the word "actually," as the Association points out. The Association's apparent view—that the Covenants obligate all owners to pay for the maintenance of all common facilities equally, regardless of use—cannot be correct because it gives no effect to the unambiguously limiting phrase "using such facilities." *See Kane*, 129 A.3d at 464.

Our reading is consistent with the balance of the Covenants. For example, the Covenants provide, without qualification, that "[r]oads . . . shall be maintained by the property owners." (R.R. at 28a, 32a.) This language clearly imposes road maintenance liability on all owners (regardless of use or seasonality). Although this language may appear to contradict the use-contingent liability discussed earlier, it simply reflects the common-sense notion that virtually every owner in the Community must use the Community's roads. This is not true of other common facilities, such as those that serve only recreational purposes. Thus, with respect to roads only, the Covenants essentially create an explicit exception to the explicit rule that owners pay for maintenance of only the common facilities they use. Furthermore, although the Covenants later state that use and maintenance of all common facilities will be the "responsibility" of "grantee[s] . . . and users," that provision is clearly intended as a release of Developer's liability, not an imposition

9

of liability on owners (for which the Covenants separately and expressly provide). (*Id.*) Thus, viewing the Covenants as a whole, we conclude that they unambiguously impose liability for maintenance costs on Appellants for the roads in the Community, regardless of seasonal use or nonuse, and any other common area or facility which Appellants use. Accordingly, the trial court erred in looking beyond the clear language of the Covenants and construing them according to common law principles.[4]

Moreover, a genuine dispute of fact remains concerning the extent to which Appellants used (or are using) common areas other than roads in the Community. Attached to the Association's motion for summary judgment is the affidavit of Vera Demchenko, who avers that during her tenure as Director and Treasurer of the Association from 2010-2014, members of Appellants' family attended social events at "the Point" and used the Association's boat launch, both of which are common facilities of the Community. (R.R. at 103a.) As we have noted, Appellants deny these allegations and maintain that their use of any common facilities was restricted to roads. This dispute between the parties regarding if, when, and exactly where Appellants used common facilities other than roads is central to their liability under the Covenants and must be resolved by the trial court as factfinder. On remand, the trial court must first make such findings and, if it finds that the alleged use did occur, it must determine the extent of Appellants' payment obligations under the Covenants in light of that use. Depending upon the specific factual findings, the trial court may need to determine whether, under the Covenants, an isolated instance of use triggers an obligation in full for the year in which the use occurred, an ongoing obligation,

---

[4] We address the trial court's reliance on common law payment obligations (under, *inter alia*, *Spinnler Point*) in the next subsection of this Opinion.

10

or some form of prorated obligation based on the frequency or extent of the use. For these reasons, with respect to Count I, the trial court erred in granting summary judgment in favor of the Association and did not err in denying summary judgment in favor of Appellants.

*2. Easement/Common Element Ownership and Use (Counts III and VI)*

We next consider whether summary judgment was warranted under common law governing covenant and easement relationships. The trial court, in granting summary judgment in favor of the Association with respect to Counts III and VI, essentially held that Appellants are liable for maintenance costs on all common facilities by virtue of their right to use those facilities. Such rights are set forth in the Covenants in the form of an easement (the basis for the Association's Count III) and are appurtenant to Appellants' ownership interest in the Properties (the basis for Count VI).

Appellants argue that the trial court erred because it applied common law doctrines that are meant to apply only in the absence of an express contractual arrangement regarding liability for maintenance costs. Here, Appellants contend, the Covenants specifically state that Appellants are required to pay only for the common facilities that they use (not that they have *the right* to use), thus making the common law rules at issue inapposite. In response, the Association cites several cases holding that, where a party enjoys an easement, there is an implicit obligation to pay for its maintenance. In reply, Appellants reiterate their argument that common law obligations to pay for easements do not apply because here, unlike in those cases, the Covenants expressly address maintenance cost liability.

The Association is correct that, in several cases where covenants allow use of common facilities, our courts have held owners liable for maintenance payments for

11

those facilities absent an express covenant to that effect. *See Hess v. Barton Glen Club, Inc.*, 718 A.2d 908, 913 (Pa. Cmwlth. 1998), *appeal denied*, 737 A.2d 745 (Pa. 1999); *Spinnler Point*, 689 A.2d at 1028; *Meadow Run & Mountain Lake Park Ass'n v. Berkel*, 598 A.2d 1024, 1026-27 (Pa. Super. 1991), *appeal denied*, 610 A.2d 46 (Pa. 1992).

Critically, however, and unlike in this case, the relevant covenants in those cases did not expressly address maintenance cost liability for the common facilities at issue. *See Hess*, 718 A.2d at 913 (imposing maintenance obligation beyond express $30 "lake and park assessment" contained in covenant); *Spinnler Point*, 689 A.2d at 1028 ("[T]he chain of title makes no reference to . . . the obligation to pay assessments, dues or fees."); *Meadow Run*, 598 A.2d 1026 ("[T]he deed does not explicitly spell out the exact obligation . . . [for] payment of dues for maintenance . . . ."). Here, as we have discussed, the Covenants *do* spell out Appellants' obligation for payment of maintenance costs for common facilities. We hold, therefore, that Appellants' maintenance cost liability is governed by that clear language, not by common law rules designed to apply in the absence of an express agreement. Accordingly, Appellants are entitled to prevail as a matter of law on Counts III and VI. The trial court, therefore, erred with respect to those Counts in granting summary judgment in favor of the Association and denying Appellants' summary judgment motion.

### 3. Uniform Planned Community Act (Count V)

Concerning the Act—the last remaining basis for the trial court's grant of summary judgment—the trial court first acknowledged that creation of the Community and the Association occurred long before the Act became effective. The trial court then applied the Act retroactively to conclude that the Community

12

constitutes a "planned community" and the Association constitutes a "unit owners' association" under the Act.[5]  Based on this, the trial court further concluded that the Association has the authority under the Act to collect the claimed assessments from Appellants.

Appellants acknowledge that portions of the Act apply retroactively, but they argue that the instant case is analogous to *Rybarchyk v. Pocono Summit Lake Property Owners Association, Inc.*, 49 A.3d 31 (Pa. Cmwlth. 2012), *appeal denied*, 68 A.3d 910 (Pa. 2013), where we refused to allow an association formed by unit owners to collect compulsory assessments under retroactive application of the Act.

---

[5] Section 5103 of the Act, 68 Pa. C.S. § 5103, sets forth the following definitions, in relevant part:

> **"Association" or "unit owners' association."** The unit owners association organized under [S]ection 5301 [of the Act] (relating to organization of unit owners' association).
>
> **. . . .**
>
> **"Planned Community."**  Real estate with respect to which a person, by virtue of ownership of an interest in any portion of the real estate, is or may become obligated by covenant, easement or agreement imposed on the owner's interest to pay any amount for real property taxes, insurance, maintenance, repair, improvement, management, administration or regulation of any part of the real estate other than the portion or interest owned solely by the person . . . .

Section 5301 of the Act, 68 Pa. C.S. § 5301, provides:

> A unit owners' association shall be organized no later than the date the first unit in the planned community is conveyed to a person other than a successor declarant.  The membership of the association at all times shall consist exclusively of all the unit owners . . . .  The association shall be organized as a profit or nonprofit corporation or as an unincorporated association.

**(Footnote continued on next page…)**

Essentially, Appellants claim that the Community does not constitute a "planned community" under the Act because the Association is not a "unit owners' association" as described in Section 5301 of the Act and, therefore, has no authority to collect assessments under the Act. Alternatively, Appellants argue that, even if the Act applies, its standard provisions cannot displace the preexisting arrangement created by the Covenants, which allows the Association to collect assessments only for roads and for other common facilities that Appellants use. Finally, Appellants insist that the Association's bylaws do not require membership or payment of the charged assessments.[6]

In response, the Association purports to distinguish *Rybarchyk* and relies instead on our decision in *Pinecrest Lake Community Trust ex rel. Carroll v. Monroe County Board of Assessment Appeals*, 64 A.3d 71 (Pa. Cmwlth. 2013), where we held that an association had authority under the Act despite not meeting the formal requirements set forth in Section 5301 of the Act. Relying on our reasoning in *Pinecrest Lake*, the Association essentially argues that it is authorized to collect assessments for all common facilities under the Act because the Association functions as the Community's unit owners' association.

"[C]ertain provisions of the [Act] retroactively apply to all planned communities created before the [Act]'s effective date." *Pinecrest Lake*, 64 A.3d at 74 (emphasis omitted). We have applied the definition of "planned community"

---

[6] Throughout their briefs, the parties dispute the effect of the Association's bylaws on Appellants' obligation to pay. We resolve this dispute by pointing out, as Appellants do, that "nothing . . . gives [an association] the right to bind non[]members or make membership mandatory absent a shared obligation." *See Huddleson v. Lake Watawga Prop. Owners Ass'n*, 76 A.3d 68, 73 (Pa. Cmwlth. 2013), *appeal denied*, 84 A.3d 1065 (Pa. 2014). In other words, the Association's bylaws do not independently obligate Appellants to become members of the Association or pay maintenance fees for common facilities. That obligation must arise from some other source that binds Appellants as owners of the Properties, such as the Covenants, common law, or the Act.

14

from Section 5103 of the Act retroactively in many cases to determine whether a pre-Act conveyance creates a planned community. *See, e.g., id.* at 75; *Rybarchyk*, 49 A.3d at 35. Here, given our construction of the Covenants, it is clear that, in the language of the Act, Appellants are "obligated by covenant . . . to pay [an] amount for . . . maintenance" of, at a minimum, the roads within the Community. Accordingly, we agree with the Association that the Properties are part of a planned community and are subject to the Act to the extent that its provisions apply retroactively.

That is not, however, the end of our inquiry, for retroactive application of the Act "do[es] not invalidate specific provisions contained in existing provisions of [a] declaration." 68 Pa. C.S. § 5102(b). A "declaration" is "[a]ny instrument, however denominated, that creates a planned community." 68 Pa. C.S. § 5103. This protection of preexisting arrangements, regardless of form and even if contrary to the Act's standard requirements, reflects a concern "that the application of certain organizational requirements of the [Act] to pre[]existing planned communities could violate the constitutional prohibition against impairment of contracts and lead to confusion among unit owners and declarants." *Pinecrest Lake*, 64 A.3d at 80. Accordingly, Pennsylvania courts have upheld the organizational structure of pre-Act planned communities even when the regime of underlying covenants differs from the Act's requirements or typical planned community arrangements.

In *Pinecrest Lake*, we examined a pre-Act planned community created by a trust agreement requiring all unit owners to make payments to the trust. We determined that an entity such as the trust need not meet the formal requirements of Section 5301 of the Act to qualify as an "association." Instead, we examined the functional legal regime created by the trust agreement, noting that unit owners paid

15

dues to and were the sole beneficiaries of the trust. We concluded that, because "the [t]rust performs the essential protective functions of an owners' association," the trust could constitute an "association" under the Act without meeting the formal requirements of Section 5301. *Pinecrest Lake*, 64 A.3d at 80-81.

In the instant case, with respect to roads, the Covenants impose a mandatory requirement of payment for maintenance. Accordingly, under *Pinecrest Lake*, the Association (which manages the maintenance of those roads) qualifies as an "association" under the Act for purposes of roadway maintenance, and, thus, the Association may collect assessments for roadway maintenance under Section 5302(a)(2) of the Act, 68 Pa. C.S. § 5302(a)(2).[7] With respect to other common facilities, however, the Covenants impose a payment obligation only to the extent that Appellants use those common facilities—an arrangement that differs from the Act's compulsory assessment regime. Those Covenants are the Community's "declaration"—its founding and governing document—and retroactive application of the Act's standard provisions cannot invalidate them. *See* 68 Pa. C.S. § 5102(b). Accordingly, we hold that, just as the Act did not invalidate the organizational structure of the trust in *Pinecrest Lake*, 64 A.3d at 80, the Act does not invalidate the maintenance cost regime clearly imposed by the Covenants.

Thus, although the Association (and the trial court) are generally correct that the Association has authority under the Act, we cannot agree that the Act authorizes the Association to collect maintenance costs from Appellants for common facilities (other than roads) that they do not use. Instead, the Association's authority under the Act is limited to the extent of Appellants' obligations under the Covenants. As

---

[7] Section 5302(a)(2) of the Act permits "the association" to "collect assessments for common expenses from unit owners." Section 5302(a)(2) is retroactive. 68 Pa. C.S. § 5102(b).

we have said, the factual issue of use is in genuine dispute between the parties. Summary judgment was, therefore, not supported by the Act with respect to Count V, and the trial court erred in so concluding. Moreover, because of this genuine factual dispute, the trial court did not err in denying Appellants' summary judgment motion with respect to Count V.

## B. Affirmative Defenses

Notwithstanding the above analysis, the trial court's grant of summary judgment in favor of the Association was premature, because the trial court never addressed Appellants' affirmative defenses of consent and estoppel and collateral estoppel. Specifically, Appellants argue that the trial court erred in failing to conclude that the Association's claims are barred by the doctrines of consent and estoppel because, from 1982 through 2008, the Association always billed—and Mr. and Mrs. Kuzmack always paid—only for their proportionate share of nonwinter road maintenance costs. Appellants also argue that the trial court erred in failing to conclude that the Association's claims are barred by the doctrine of collateral estoppel, because a 1981 magisterial district court judgment against Mr. Kuzmack establishes that the Association can only collect a proportionate share of nonwinter road maintenance costs from Appellants. The trial court failed to consider whether Appellants' affirmative defenses in any way precluded the Association from prevailing on its claims. Consideration of those affirmative defenses was a prerequisite to entering summary judgment on behalf of the Association.

## C. Attorney's Fees

As to Appellants' argument that the trial court's award of attorney's fees was excessive and unreasonable, due to the above rulings, any award of attorney's fees

is premature. Thus, we must strike the trial court's award of attorney's fees at this stage of the proceedings.

## IV.  CONCLUSION

Pursuant to the foregoing analysis, Appellants are entitled to prevail as a matter of law with respect to Counts III and VI of the Complaint.  The resolution of Counts I and V of the Complaint, however, involves genuine issues of material fact with regard not only to the causes of action but also, in all likelihood, with regard to Appellants' affirmative defenses.  Thus, the trial court erred in granting summary judgment in favor of the Association with respect to Counts I, III, V, and VI of the Complaint.  Additionally, the trial court erred in denying summary judgment in favor of Appellants with respect to Counts III and VI of the Complaint but did not err in denying summary judgment in favor of Appellants with respect to Counts I and V of the Complaint.  Accordingly, we will affirm in part, reverse in part, and remand this matter to the trial court for further proceedings on the remaining counts of the Complaint—*i.e.*, Counts I and V.  We will also strike as premature the trial court's award of attorney's fees.

P. KEVIN BROBSON, Judge

18

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Briar Hill North Association, Inc. :
:
        v. : No. 934 C.D. 2019
:
Joan K. Keil, Individually and in :
Her Capacity as the Executrix of :
the Estate of Helen M. Kuzmack, :
Mary Jo Sanford, Helenann :
McCloskey, Jeannette K. Murphy, :
and John A. Kuzmack, :
                   Appellants :

# **O R D E R**

AND NOW, this 20th day of July, 2020, the order of the Court of Common Pleas of Wayne County (trial court), dated June 13, 2019, is AFFIRMED, in part, and REVERSED, in part. The trial court's order is AFFIRMED to the extent that it denied summary judgment in favor of Appellants as to Counts I and V, and it is REVERSED to the extent that it denied summary judgment in favor of Appellants on Counts III and VI and to the extent that it granted summary judgment in favor of Briar Hill North Association, Inc. with respect to Counts I, III, V, and VI. Further, the trial court's award of attorney's fees is STRICKEN without prejudice. This matter is REMANDED to the trial court for proceedings consistent with the attached opinion.

        Jurisdiction relinquished.

                                       P. KEVIN BROBSON, Judge